JAMES F. HALEY *vs.* LYMAN G. CASE & another.

Suffolk.    March 25, 26. — July 3, 1886.    W. ALLEN & HOLMES, JJ.,
                                absent.

If a servant, who is engaged in backing, while standing at his horses' heads, a loaded van, is directed by his master to mount the van and drive it under a gateway, over which there is a sign, and then to back down, the master being familiar with the practice of so driving vans, and the servant, though an experienced teamster, never having driven under the gateway before, and their relative positions are such that the master has better means of observation than the servant, whose attention is devoted chiefly to the management of his horses, and of seasonably appreciating the dangers attending the act, and the servant, in following the directions of the master, is injured by coming in contact with the sign, the servant may maintain an action against the master for such injury.

TORT, against Lyman G. Case and Ephraim Dodge, copartners, doing business under the firm name of Case and Dodge, for personal injuries sustained by the plaintiff while in the employ of the defendants.

At the trial in the Superior Court, before *Rockwell,* J., it appeared that the defendants were teamsters, having a stable abutting on Perry Street, in that part of Boston formerly Charlestown; that the grade of Perry Street rises somewhat from the stable to the end of the street, where is a yard owned by one Mead, with a gateway to it from the end of Perry Street; and that over the gateway is a sign with Mead's name on it.

The plaintiff testified that he was twenty-seven years old, had been a teamster seven or eight years, and had been in the employ of the defendants for four or five years; that on the morning of January 26, 1883, he drove a caravan weighing forty-four

hundred pounds, upon which were twenty-two or twenty-three bundles of hay, weighing about two hundred and twenty pounds apiece, to Perry Street; that on arrival he found the defendant Dodge there, who told him to drive up and unload; that he got down and took the horses by the head to back them, when Dodge said, " Get up on your team where you belong;" that he then got up on the hay, which was piled three bales high, and drove alongside the stable, and then turned the horses to swing the hind end of the caravan under the hay-loft door; that, while he was doing this, Dodge said, "Hold on, where are you going;" that he then stopped, and the pole of the caravan caught on a sled which was in the road opposite the defendants' stable; that Dodge then opened Mead's gate, and said, " I want you to drive up there, and back down."

The testimony of this witness then continued as follows : " I started my horses with my reins. I was sitting on top of the hay, and I started my team. It was hard pulling, and I had to watch the horses. I had all I could do to watch my horses; they could hardly stand up; the horses were not shod right; the shoes were all worn out, and, when I got within two or three feet of the gate, I saw that I was going to get hurt, and I tried to stop the horses but could not, and I ducked down, going underneath the fence. I got my back broke. My head went clear. The lower part of my back, about half-way or a little below, was struck by the sign which was across the gate, on the top of it. Had delivered hay at the defendants' stable before that time, — four or five times before. Had never gone under the gate or sign before. Had been accustomed to drive up and suit myself about putting my team in. Had put my team in before the same way that I was going to do that day, that is, drive right up close to the stable, swing round to the right and swing the hind end of the caravan under the door and back the forward end in; could have done that that day. Don't remember much after I was struck by the sign; remember being carried home. The night after the accident, Dodge called at my house and said that he was very sorry that it happened. I told him if he had let me do as I wanted to do, it never would have happened. He said, ' That is so, Jim; I know it is my fault.' When Dodge told me to drive under the sign, he was near the gate at my forward

wheel, about fifteen or eighteen feet from the gate when he told me to drive up there."

On cross-examination, the plaintiff testified that he knew how to manage horses; that the horses he was driving were good pulling horses, not hard to manage; that there was nothing vicious about them; that he should consider that this accident was due in some way to the trouble with the horses; that their shoes were smooth and all worn out; that there was a rise in the ground there, and the horses had all they could do to get up there; that there was snow and ice on the ground; that the shoes of the horses had been smooth for a week, but he did not remember telling any one of this, and did not know that either of the defendants knew of it; that he made no objection to the manner in which the caravan was loaded, and did not know that there was any objection to it; that when the defendant Dodge told him to get on the team, he did not then consider it an improper thing to do, and did not now so consider it; that it was all right to do so; that he judged that Dodge was trying to make him back in the team the easiest way, and was intending to help him; that he intended to drive the forward part of the caravan, including where he was sitting, inside the gate, and then to back down; that the sign-board did not look to be lower than the top of the bales; that he did not think there was space to get in without stooping; that, if he had not thought he could get through all right, he would not have gone there, even though told to drive in; that Dodge was nearer the gate than he was, and could tell better whether he could get under the sign; that Dodge's attention was drawn to the gate, and his to the horses; that he looked at the gate, and thought he could get through by stooping.

He further testified as follows: "Told Mr. Dodge that if he would let me go the way I wanted to go, I would back the team in. Had to do as he told me, or I would have to get another job. When I got up to within two or three feet of the sign, I found that it was lower than I thought. I saw I was going to get hurt, and tried to stop my horses, but could not, and I ducked down under the sign. I think I could have got through if there had been six inches more height. If I had tried to stop the horses before I had got within three feet of the sign, I could not

have done so; they were pulling so hard, it took quite a while to stop them. If I had known I was going to get hurt, I could have stopped the horses within five feet of the place, or else I would have jumped off. My attention was drawn to the horses. They were pulling, and I was looking at my horses' heads, to go through this gate, and I happened to see this sign so close to me. That was when I was within a foot or two of it. If I had looked when a foot or two further off, I could have stopped them in season. When I found that I could not get through without an accident, I could not get off the load. My legs were in front of the load. If I went to jump off or start, I would get jammed somewhere else. I knew I was going to get hurt, and I thought I would get through it the best way I could. Do not know whether I fell off the load, or remained on it after it went through."

The caravan used by the plaintiff was seventeen feet in length, and the pole was nine feet, making the length of the caravan with pole attached twenty-six feet. The distance from the gate, over which the sign extended, to the hay-shed door was eight feet.

William E. Macomber testified that he was present when the accident happened, and heard Dodge tell the plaintiff to drive up there and back down; that he noticed the plaintiff when he started in the direction of the sign, and thought he could get through by stooping; that he thought so until he got within a few feet of the sign, and then he cried out to the plaintiff, and Dodge also cried out; that he had driven teams through this gate before, when he was unloading at the stable; that it was a common thing to deliver hay in that way; that it was the usual way when there were any sleighs in the road, the way he always did; that he should not think it was a proper way that day, because it was too slippery and the horses were smooth.

James C. Callahan testified that he was in the hay-loft at the time of the accident, and heard the conversation between the plaintiff and Dodge; and that he thought the plaintiff would get through without touching the sign.

George H. Rooney testified that he was on the load of hay with the plaintiff, though lower down. He corroborated the testimony of the other witnesses as to the conversation between

the plaintiff and Dodge. He also testified, on cross-examination: "Where I was, I thought Haley would get through all right. About two feet before he .struck the sign, I thought he would not get through. He might if he had looked, but he was not paying any attention to the sign; he was looking at the horses."

The testimony in behalf of the defendants tended to show that it was not expected that the plaintiff would drive so far into the gateway; that, for the purpose of backing to the stable, it was only necessary to drive the horses part way under the sign; and that the plaintiff was warned of the danger from the sign when he was fifteen or twenty feet from it.

In rebuttal, the evidence for the plaintiff tended to show that, in order to back to the stable by going into Mead's yard, it was necessary for the plaintiff to go as far as he attempted to go.

At the close of the evidence, the defendants requested the judge to instruct the jury that there was no evidence upon which the plaintiff was entitled to a verdict; but the judge declined so to rule. The defendants further requested the judge to instruct the jury as follows: "1. If the plaintiff, before undertaking to drive the team into Mead's gateway, knew, or if he afterwards discovered, or if by the exercise of ordinary observation he could discover, that to drive into the gateway would involve the probability, or possibility, of driving under the sign, and that there was not sufficient space for him to drive under with safety to himself, and if, notwithstanding such knowledge, or means of knowledge, he voluntarily undertook to drive the team into the gateway, as directed by the defendants, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the defendants, in case the plaintiff's driving into the gateway caused him an injury. 2. The master is under no higher duty to provide for the safety of the servant, than the servant is to provide for his own safety. If the knowledge or the ignorance of the plaintiff, and that of the defendants, in respect of the condition of things and of the probable results of undertaking to drive the team into the gateway, for the purpose of unloading at the defendants' stable, were equal, so that both were either without fault or in equal fault, the plaintiff cannot recover."

The judge read these requests for instructions to the jury; and instructed them as follows:

" Those requests I could give to you, but I must give them with this added consideration and direction: This is not the case of an employee acting in the absence of his employer. It is a case where the plaintiff, the employee, was in the presence of his employer, and where the employer gave directions; and in that case, in giving these instructions, it is my duty to say that the relation of employer and employee is to be considered as an important relation. How important it is in each particular case is not a question of law. It may be of less, it may be of greater, effect in one case than in another, and that is to be ascertained by the jury; but the instruction as to the relation of employer and employee is to be considered by the jury as important, — as of some importance. This relation is of importance in ascertaining whether either was negligent, or whether both were negligent; but the extent of the effect of that relation in this case is for the jury to ascertain and determine; and in stating those requests, which, I think, would have been proper if the employer had not been present, and the case had not been peculiar in that respect, I must give them in connection with the other statement which I have just read to you, which is that that relation of employer and employee, the employer being present and giving directions at the time, is a matter of importance in the settlement of those questions; and the jury are to consider of how great importance, and of what effect it shall have upon the settlement of them."

The jury returned a verdict for the plaintiff, in the sum of $5000; and the defendants alleged exceptions.

*R. M. Morse, Jr.*, for the defendants.

*W. Gaston & J. F. Dore*, for the plaintiff.

FIELD, J. It is not denied that, if Dodge was personally negligent in giving directions to the plaintiff in the performance of his work, and if the plaintiff used due care, both the defendants are liable. *Ashworth* v. *Stanwix*, 3 El. & El. 701.

As the plaintiff was of full age, and an experienced teamster, if the danger of driving the horses with the van under the gateway was well known to him, he cannot recover, although he was acting under the immediate personal direction of Dodge.

The fear of the plaintiff that he would be discharged from his employment, if he did not obey the orders of Dodge, his employer, would not justify him in running a risk which was well known to him, and then, if injured, in recovering damages from his employer. *Russell* v. *Tillotson*, 140 Mass. 201. *Taylor* v. *Carew Manuf. Co.* 140 Mass. 150. *Leary* v. *Boston & Albany. Railroad*, 139 Mass. 580. *Moulton* v. *Gage*, 138 Mass. 390. *Williams* v. *Churchill*, 137 Mass. 243.

The principle is said to be, that, " where the servant has as good an opportunity as the master of ascertaining and obviating the danger for himself, he will have no recourse against the latter." Fraser's Master and Servant (3d ed.) 176. See also *Woodley* v. *Metropolitan District Railway*, 2 Ex. D. 384; *Ogden* v. *Rummens*, 3 F. & F. 751.

From the testimony, it was competent for the jury to find that the defendant Dodge assumed the personal direction and control of the plaintiff in determining where the team should be driven, and that he was familiar with the practice of driving loaded vans under the gateway ; that the plaintiff had never driven under the gateway before ; that the danger was not obvious from the place where the plaintiff started his team, in any such sense that it was not a reasonable opinion from observation at this place that he could drive through the gateway in safety; that the plaintiff's attention was necessarily chiefly devoted to the management of the horses, and that he did not discover the danger until it was too late to save himself; and that the defendant had better means of observation, and of seasonably appreciating the danger, and either did not warn the plaintiff at all, or warned him when it was too late. On such findings, we cannot say that the plaintiff was not in the exercise of due care, or that the defendant was. The test is not only what each knew, but what each reasonably ought to have known, concerning the risk ; and we cannot say that identically the same duty rested on the servant and on the master seasonably to ascertain the extent of the danger involved in performing the work in the manner ordered by the master. If the master personally interferes in the performance of work, and, in consequence of this negligence, a servant is injured, the master is liable, unless the carelessness of the servant is a defence. *Roberts* v. *Smith*, 2 H. & N. 213.

And, when the master undertakes to direct specifically the performance of work in a particular manner, we cannot say, as matter of law, that the servant is not justified in relying to some extent upon the knowledge and carefulness of his employer, and in relaxing somewhat the vigilance which otherwise would be incumbent upon him. The servant's attention must be principally directed to the performance of the work in the manner in which he is ordered to perform it, and he may be in a less favorable position to see and judge of the surrounding dangers; and, when he is suddenly called upon to perform a piece of work in a particular manner, under the eye of his employer, he may not reasonably have time for the most careful observation.

This court has perhaps recognized that the servant may put some reliance upon the master, when he assumes control of the work and gives specific orders; and that there is not precisely the same obligation resting upon each to ascertain what the dangers are. In *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572, 585, although the case was decided on the ground that the servant was incapable of understanding and appreciating the danger to which he was exposed, and that the employer set him to work without properly instructing him in regard to his work, and the dangers attending it, the court say: "Some allowance should be made for his youth, his inexperience in the business, and for the reliance which he might have placed upon the direction of his employers."

In *Atlas Engine Works* v. *Randall*, 100 Ind. 293, it is said, "If the attention of the appellee had been, as in the Massachusetts case, withdrawn from the source of danger by the requirements of his employment, the case would involve considerations which are conspicuously absent."

*Keegan* v. *Kavanaugh*, 62 Mo. 230, is the case of a hod-carrier, who, in obedience to a positive order of his master, went down to build a stone wall at the foot of an embankment of earth, which was not shored or propped up, and which fell upon the plaintiff. The court say, "If the risk is such as to be perfectly obvious to the sense of any man, whether servant or master, then the servant assumes the risk;" but that "the superior information of the master was relied on, and his better means of information

as to the character of the ground;" and a verdict for the plaintiff was sustained.

In *Lee* v. *Woolsey*, 110 Penn. St.     , it is said, " If an employee is in haste called upon to execute an order requiring prompt attention, he is not to be presumed necessarily to recollect a defect in machinery, or a particular danger connected with his employment, so as to avoid it."

The plaintiff in this case was an experienced teamster, but he may not have had the same experience as the defendant Dodge of the possibility of driving the loaded van safely under the gateway. The more important matter is, however, that he might not have had the same opportunity of estimating the danger, and from the nature of his employment he was required to devote his attention principally to the management of his horses, while his master had assumed the responsibility of directing where the plaintiff should drive, and was free to observe carefully all the dangers which the plaintiff might incur in executing his orders. We think that the requests for instructions were properly modified by the consideration of the fact that the plaintiff was acting in the presence and under the directions of one of the defendants, who was his master. If the charge in this respect is not so definite as might be desired, it was not erroneous or misleading.                              *Exceptions overruled.*