E. H. Johnson, Administrator, Appellant, v. Minneapolis & St. Louis Railroad Company, Appellee.

MASTER AND SERVANT: Method and Plan of Work—Negligent Construction of Bridge. A master may be guilty of actionable negligence by adopting an unsafe plan and method of doing his work. So held in the construction of a railway bridge.

PRINCIPLE APPLIED: In building a railway bridge, it was necessary to bore certain holes in the timbers which were beneath the ties. This was ordinarily done from a scaffold, consisting of a hanger, or stirrup, and a plank. The hanger was made by bending an iron bar into the shape of a long "U," the ends of the bar *ordinarily* being threaded to receive a nut, after a *flat* iron, with holes in the ends, was slipped on. This *flat* iron was then looped over the end of the overhanging tie, and extended below the ties for a distance of several feet. A plank was then slipped into the closed end of the "U," and the scaffold was complete. The superstructure also required a railing resting on the top of the ends of the ties, and about 4 inches from the ends thereof. The approved and proper method to do the work was to do the boring first, and later to build the railing, for the reason that, when the railing was in place, the *flat* iron of the hanger had only 4 inches on which to rest, or hang, instead of 18 inches, before the railing was built. The probability of the hanger's slipping from this 4 inches was a source of danger. In the instant case, *the railing was built first,* owing to the non-arrival of other material. Later, the foreman *twice* directed the workmen to use the U-shaped hangers, in boring the holes below the ties. The jury could have found that the master had but two hangers at the bridge. Deceased and his fellow workman in some manner secured these two hangers. Whether one man carried both of them to the place where they were to be used, or whether each man carried one, does not appear. The scaffold was rigged up. The men worked on opposite ends of the scaffold. The hanger at the end of the scaffold *where deceased worked* was made in the *ordinary* way. The hanger at the end where the other workman was engaged *was not threaded,* but had the ends so bent as to form a round hole, through which a *round* rod was inserted, and this was looped over the end of the tie, instead of the *ordinary flat* piece of iron. This rod did not fit tightly into the round hole, but was loose. The jury could have found that the deceased had no

knowledge of this defective hanger, and had never seen it. The boring caused the scaffold to sway, and the round, loose rod to roll. No appliance was furnished the workmen to prevent the hangers from slipping from the ends of the ties. There was evidence that the deceased had been told to drive nails outside the crossbar of the hangers, and also that, preceding the accident, and while working at *another* place on the bridge, the attention of deceased was called to the exceptional shortness of the tie then used, and to the fact that the hanger at the opposite end from where deceased was working ought to be nailed. While deceased was working, his fellow workman left the scaffold, the hanger at the end where the fellow workman had been working slipped off the tie, the scaffold fell, and deceased was killed. *The hanger at the end where deceased was working remained in place.*

*Held*, a jury question was presented on the issue whether the master was negligent:

1. In adopting an unsafe method or plan of doing its work: to wit, in building the railing prior to boring the holes.

2. In furnishing the deceased and his fellow workman an unsafe tool: to wit, the defective hanger.

3. In ordering the deceased to work in a place which he (the master) knew was unusually dangerous by reason of the defective appliance, and not so known to deceased.

4. *Held*, further, the deceased did not, as a matter of law, assume the danger attending the use of the defective hanger.

5. *Held*, further, that deceased had the right to assume that the hanger was reasonably safe.

**MASTER AND SERVANT:** Safe Tools—Defective Hanger for
2   Scaffold. A master is guilty of negligence in furnishing a servant with an unsafe tool, not known by the servant to be unsafe.

PRINCIPLE APPLIED: See No. 1.

**MASTER AND SERVANT:** Assumption of Risk—Master's Neglect.
3   A servant does not assume dangers unknown to him, and arising from the neglect of the master.

PRINCIPLE APPLIED: See No. 1.

**MASTER AND SERVANT:** Assumption of Risk—Assumption as
4   Matter of Law. It requires a very clear case of knowledge and appreciation of danger on the part of a servant before it may be said, as a matter of law, that he assumed the danger attending the doing of a thing, when he did it with the one instrumentality *specifically directed by the master*.

PRINCIPLE APPLIED: See No. 1.

MASTER AND SERVANT: Safe Tools—Servant's Right to Assume Tools to be Safe. A servant, no knowledge on his part to the contrary appearing, has the right to assume that a tool furnished to him by the master is reasonably safe for the purposes for which intended.

PRINCIPLE APPLIED: See No. 1.

*Appeal from Webster District Court.*—R. M. Wright, Judge.

November 17, 1917.

Rehearing Denied March 15, 1918.

Action at law to recover damages on account of the alleged wrongful injury and death of plaintiff's intestate. There was a directed verdict and judgment for defendant, and plaintiff appeals.—*Reversed and remanded.*

*E. H. Johnson,* and *Kenyon, Kelleher & Price,* for appellant.

*Burnquist & Joyce,* for appellee.

1. MASTER AND SERVANT: method and plan of work: negligent construction of bridge.

Weaver, J.—The deceased was a bridge carpenter, working at his trade in the defendant's employment, in the construction of a bridge upon its line of railway. At the time in question, he, with a fellow workman, was engaged in boring auger holes through braces at the cap timbers resting upon the piles which supported the structure. To do this work, it was necessary for the workmen to occupy a position beneath the ties which support the track. To meet this need, a plank somewhat longer than the width of the bridge was suspended under the upper structure, and held in place by two iron hangers made for that purpose, and looped over or suspended from opposite ends of one of the crossties. The device was moveable, and was changed from place to place as needed in the prog-

ress of the work. On February 24, 1913, the deceased was in his place, upon the scaffold thus constituted, boring a hole in a brace on the east side of the bridge, and his com- panion, Johnson, was similarly engaged on the west side. Johnson was evidently first to complete the hole which he was boring, and climbed from the plank to the top. As he did so, the iron hanger on that side slipped from the end of the tie on which it was hung, causing the plank to fall and draw out of the hanger on the other side, precipitating Karlson to the ground below, and causing his death.

2. MASTER AND SERVANT: safe tools: defective hanger for scaffold.

This action is brought by the administrator of Karlson's estate, to recover damages on account of his death, for the benefit of his parents. The facts, so far as we have already recited them, are undisputed. Plaintiff charges, however, that the injury and death of his intestate was caused by the negligence of the defendant, and specifies the alleged negligence as follows: (1) That defendant negligently adopted an unsafe plan and method of work; (2) that it negligently supplied deceased's fellow workman, Johnson, with a defective hanger, by reason of which it fell from the tie, causing the accident; (3) that defendant's foreman saw and knew the defective condition of the hanger, and failed to do anything or to take any measures to prevent accident therefrom; also, that defendant was negligent in permitting Johnson to use the hanger; (4) That defendant failed to furnish deceased a reasonably safe place to work; and (5) that Johnson, the fellow workman of the deceased, was negligent in his manner of leaving the scaffold, causing it to sway, vibrate, and fall, and that such negligence is imputable to the defendant.

The defendant denies all allegations of negligence on its part, and in various forms pleads that the risk of injury and death in the manner described was assumed by the deceased. It further pleads that its railway was, at the

time, engaged in the business of interstate commerce, and that the work on which deceased was employed was of that character.

The hanger, which, the evidence tends to show, was ordinarily used in work of the kind described, is made by taking a strap or bar of iron, and bending it into a shape having some resemblance to an elongated letter U, the bottom part of which is made broad enough to let in the plank which is to serve as a scaffold. On the upper end of each of the parallel uprights of the hanger, a thread is cut to receive a nut. These ends pass through holes in another flat bar of sufficient length to fit over them, and when this crossbar is secured by the nuts on the ends of the uprights, the device is complete. When hung in place to receive the plank, the crossbar rests on the upper face of the tie, which, in the present case, was sawed smooth. The hanger on Karlson's side of the bridge was of the usual kind, which we have here attempted to describe. The one on the opposite side of the bridge, where Johnson worked, was different in the following respect: the upright bars, instead of being finished at the top with threads and nuts and crossbar, were each bent or turned over to make an eye, and through these eyes, a round bolt of sufficient length was inserted, and made to serve the purposes of a crossbar. The evidence further tends to show that this bolt did not fit tightly in the eyes, but was loose, and when in place, was liable to roll on the face of the tie; and this is one of the facts upon which the charge of negligence on the part of defendant is founded. Another condition complained of in this connection is the following: The plan of the bridge contemplated the fastening of wooden guard rails outside of and parallel with the track across the top of the ties, and within about four inches of their ends on either side. In the regular and usual course of construction, these guard rails are not laid until after the work of boring and fas-

tening the braces has been done. In this instance, however, owing to some delay or confusion in supplying the materials, the guard rails were put in place first, with the result that, when Karlson and Johnson were ordered to bore the braces, there were only about four inches of either end of the ties on which to suspend the hangers. When deceased and Johnson began boring the holes, they did not use the hangers, but in place thereof, extended a plank across the caps resting on the piles, and from the plank reached the braces with their augers. They had worked in this manner for a time, when the assistant foreman, who was in immediate charge and oversight of their labor, directed them to use the hangers. This order was twice given. The tools and implements for the use of the workmen were kept on a platform made for that purpose at the end of the bridge, and there Karlson and Johnson obtained these hangers, which, according to the apparent preponderance of the evidence, were the only ones furnished at that place; though there is evidence tending to show that there were others in one of the cars left at the station of Arnold, some distance away. Up to that time, no use had been made of hangers in the construction of the bridge, and they had been in use on this occasion not more than an hour or two when the scaffold fell. Whether the hangers were both carried from the platform to the place of work by one man, or whether each carried the one he was to use, does not appear. When in their respective places on the plank, Karlson and Johnson were separated by the width of the bridge, a distance of eight feet or more, and they continued in this relative position as the work moved forward from bent to bent along the length of the structure, neither having any special reason to examine the work of the other or the condition of the hanger used by him, unless it be as they moved the scaffold from one bent to another, of which there is testimony. There was also testimony indicating that two

other persons assisted in the moving. No evidence appears
that Karlson's attention was called to the fact that the
crossbar or bolt on the hanger used by Johnson was loose
in the eyes through which it was placed, but it is the con-
tention of defendant that, as a matter of law, he must have
known it, or, in the exercise of reasonable care, he ought to
have known it. The testimony of the defendant's foreman,
who directed the use of the hangers, is to the effect that the
natural swaying and vibration of the suspended plank
tended to make the top of the hanger work outward toward
the end of the tie, a tendency which would naturally be
more marked where the crossbar is in the form of a roller
than where it is in the form of a flat and rigid bar. That
it was the roller-top hanger which fell is shown without
controversy, for the one on Karlson's side was found after
the accident to be still in place. No appliance was fur-
nished the workmen to tie or hold the hangers in place,
though the chief foreman testifies that, on different occa-
sions, he had told Karlson to drive nails in the ties outside
of the crossbar of the hangers to hold them in place; but,
so far as relates to the hanger used by Karlson on this oc-
casion, his omission so to do appears to have had no con-
nection with his fall, because, as we have seen, that hanger
did not leave the tie. One other witness says that, at some
point in the work before reaching the place of the accident,
he noticed that the end of the tie on which Johnson's
hanger was suspended was unusually short, leaving only
about two and one-half to three inches outside of the guard
rail, and, thinking it a source of danger, he said to Karl-
son, "There ought to be a nail outside of this hanger;" but
as this advice, if given, seems to have had reference to the
danger occasioned by the exceptional shortness of the tie,
rather than to any defect of the hanger, it has little rele-
vance to the matters now in issue, for he concedes that this

incident occurred at a place other than the place of the accident.

The foregoing exposition of the facts alleged or proved is sufficient for an introduction to the discussion of the legal propositions urged by counsel on either side.

I. Stated in brief, the contention for plaintiff is that defendant was negligent: First, in its method and plan of organizing and prosecuting the work; second, in the orders pursuant to which the deceased was at work at the time of the accident; and third, in furnishing the men with a defective hanger. Each specification is denied by the defendant, who also pleads assumption of risk by the deceased.

Taking up first the question whether, under all the evidence, the jury could properly find the defendant negligent in any of the matters complained of, we think our answer must be in the affirmative. In the first place, but for the laying of the guard rails before boring the braces and cap timbers, the projecting ends of the ties would have afforded a space of eighteen inches in length, on which to suspend the hangers in apparent safety; and the usual and proper order of construction was to do this last mentioned work first. The assistant foreman testifies:

"We do not usually put on the guard rails before boring the holes. We never did before. To my knowledge, it was done first this time because we did not have the materials for the braces there,— the material did not come in its order. The workmen then put on guard rails because they did not have anything else to do. Mr. Renshaw directed it to be done. If these guard rails had not been put on the bridge, the ties would have stuck out beyond the rails where the scaffold hangers would be hung about eighteen inches. The fact that the guard rail was on the ties prevented there being eighteen inches of this bridge on which to hang the hangers."

It was certainly within the province of the jury to find

that this departure from the usual and approved method or plan of construction added to the peril to workmen employed on a scaffold so suspended, and correspondingly increased the duty of reasonable diligence and care on the part of defendant to see that harm therefrom did not result to those exposed to such peril in carrying out its orders or performing the service which it required. It was this place of increased and unusual danger in which defendant ordered the deceased to work, and specifically directed the use of the hangers; and the jury could find from the evidence that the two hangers we have described were the only ones furnished for use at that place. That the one taken by Johnson was defective is hardly open to question. Had the round bolt used for a crossbar fitted tightly in the eyes of the uprights, in a manner to prevent it from revolving or rolling, though it might have been less desirable or less safe than if a flat bar had been used, it would, perhaps, not be a defect, in the ordinary sense of the word; but when it is shown that the bolt was loose in the eyes, so that it would operate as a roller over the smooth, hard surface of the tie, its defective condition is quite clearly established, and a finding that defendant was negligent in furnishing it and ordering its use has sufficient support in the testimony.

II. Did the deceased, as a matter of 3. MASTER AND SERVANT: assumption of risk: master's neglect. law, assume the risk of the injury occasioned by the defective hanger? Risk of this character is not one of those hazards which are merely incidental to the service in which he engages. The risks which he assumes in entering a given employment are those only which naturally and usually remain incident to such business, when conducted by the employer with reasonable regard on his part for the safety of those who serve him, and they do not include any risk or hazard created by or arising from the neglect of the employer to observe the magisterial duties which the law imposes upon

him. It is true that, under some circumstances, a servant who remains in his employer's service after he knows, or may be presumed to know, of his employer's neglect of his magisterial duties, or a servant who makes use of a tool or appliance which he knows, or ought to know, is so defective or dangerous as to expose him to injury, will be held to have assumed such risk. It must be borne in mind, however, that this plea of assumed risk is an affirmative defense, to be established by a preponderance of the evidence; and it is only in very exceptional cases that this defense is made out with such clearness and certainty that the court may peremptorily sustain it as a matter of law. Had the hanger in this case been the one which the deceased had in his own immediate possession and use, it may be that the court could say that he could not well have avoided discovering its defective condition and appreciating the danger to which it exposed him, and in such case, we should have more hesitation in holding that the court erred in directing a verdict against plaintiff. But even then, the question would not be free from doubt; for, so far as appears, Karlson had never before seen this hanger, or had any knowledge of its peculiar character or defects, and, being ordered to do the work with it, he had the right, within reasonable limits, to assume that it was a safe and suitable appliance for the use to which he and Johnson were directed to put it. He had been using it only a very short time,—a fraction of a half day,—and, considering the reliance which he could place upon the performance of defendant's duty to furnish him a hanger reasonably safe and sufficient for the purpose, it would be open to serious question whether he should be held to have assumed the risk, as a matter of law. As it was, he was chargeable with no special duty to inspect the hanger which Johnson took; though, of course, if he

4. MASTER AND SERVANT: assumption of risk: assumption as matter of law.

5. MASTER AND SERVANT: safe tools: servant's right to assume tools to be safe.

knew, or if the circumstances were such that, as a reasonable man, he ought to have known, that the hanger on that side was defective, thus exposing him to danger, his continuing work on the scaffold could well be held to operate as an assumption of the risk.

Nor does the case, as a matter of law, come within the class where the servant is directed or expected to select the appliance or implement for his use from a supply furnished by the master for that purpose; for, as we have said, the evidence would justify a finding that the two hangers in question were the only ones furnished, and that the order of the foreman to get and use the hangers had reference to these alone; and in such case, the workman, as we have already noted, could rightfully place some reliance upon the assumption that they were reasonably adapted to the work to be performed, and were not dangerously defective. *Hammer v. Janowitz,* 131 Iowa 20, 23; *McGuire v. Waterloo & C. F. Union Mill Co.,* 137 Iowa 447. In *Wilder v. Great Western Cereal Co.,* 130 Iowa 263, the master urged as a defense that the servant was injured because of his own negligence in using a stick to remove material with which a part of the machinery had become clogged, and that, having chosen that manner of doing the work, he assumed the risk; but, as there was testimony tending to show that the foreman had directed him to do the work in that manner, this court, speaking by Ladd, J., said:

."But it is said that, in selecting the stick, the plaintiff acted for himself, independent of defendant, and for this reason, the latter is not chargeable with negligence in not supplying proper tools. This might be so, had the superintendent given no directions. According to plaintiff's testimony, he was instructed merely to use a stick, and he selected one like that the superintendent had. If this was so, he was not acting independently, but under instructions as to what tool to use in unclogging the feeder. * * * He selected

such instrument, then, as he was instructed to use, and not one of his own choosing.  *  *  *  True, he did not investigate the machinery; but he had the right to assume, from the order to do the work, that there was no danger not apparent, and that he could perform it in safety."

Quite in point in principle is our holding in *Luisi v. Chicago G. W. R. Co.*, 155 Iowa 458. There, the foreman of a section gang directed three of his men to move a wet railroad crosstie, two of the men in front lifting it on the round, iron handle of a track wrench, and the third carrying the rear end of the tie. In attempting to load it on a car, the tie slipped from the iron, and injured the man at the rear. The plaintiff charged negligence, both in defendant's failure to furnish a sufficient number of men to handle the tie, and in its failure to furnish a proper appliance for such use. Replying to the defendant's contention that plaintiff assumed the risk, and was himself negligent, we said:

"The track wrench used for the purpose of carrying the front end of the tie was of small, round iron, about two feet long, which the jury might easily find from the evidence would slip under the weight of a heavy, wet tie. And furthermore, there was evidence tending to show that the proper and usual tool for loading ties of this character and size was a tie, or grab hook, which could not slip when fastened in the tie. Where an improper tool is furnished, and a servant directed to use it, the master is, or may be, liable for not providing a proper tool."

In *Rawley v. Colliau*, 90 Mich. 31 (51 N. W. 350), the Michigan court, while holding that a plaintiff injured by the use of a defective hammer, when others of a safer kind were at hand, cannot recover, proceeds to say:

"If this hammer had been the only one in the shop, *  *  *  or defendants had directed it to be used, knowing its condition, another case would be presented."

Speaking to the same question, the Massachusetts court has said:

"If the master personally interferes in the performance of work, and, in consequence of this negligence, a servant is injured, the master is liable, unless the carelessness of the servant is a defense; and when the master undertakes to direct specifically the performance of work in a particular manner, we cannot say, as matter of law, that the servant is not justified in relying to some extent upon the knowledge and carefulness of his employer, and in relaxing somewhat the vigilance which otherwise would be incumbent upon him." *Haley v. Case,* 142 Mass. 316, 322 (7 N. E. 877, 879).

Having furnished the materials of which the scaffold was constructed, and provided the method and plan of construction, it was the positive duty of the defendant to furnish materials of a kind reasonably fit for the purpose for which they were to be used. If it failed to so do, it was negligent; and unless it be established beyond dispute that the deceased knew of such neglect, or ought to have known it, and appreciated the danger to which he was thus exposed, then the question whether he assumed the risk was for the jury. *Risku v. Iron Cliffs Co.,* 163 Mich. 523; *Rihmann v. George J. Grant Const. Co.,* 114 Minn. 484; *Lee v. H. N. Leighton Co.,* 113 Minn. 373; *Lang v. Bailes,* 19 N. D. 582; *Swanson v. Schmidt-Gulack Elevator Co.,* 22 N. D. 563 (135 N. W. 207). Bearing more or less directly upon the law of this case, see also *Chicago & N. W. R. Co. v. Bayfield,* 37 Mich. 205; *Greenleaf v. Illinois Cent. R. Co.,* 29 *Iowa* 14, 47; *Rogers v. Overton,* 87 Ind. 410; *Bane v. Irwin,* 172 Mo. 306; *Illinois Steel Co. v. Wierzbicky,* 206 Ill. 201; *Norfolk & W. R. Co. v. Ward,* 90 Va. 687.

Considering the record as a whole, in the light of our own decisions above cited, and the trend of the authorities from other jurisdictions, we are of the opinion that it cannot be said, as a matter of law, that the deceased assumed

the risk to which he was exposed in obeying the order to use the scaffold, and that the motion to direct a verdict should have been overruled. The judgment below is reversed, and the cause remanded for a new trial.—*Reversed and remanded.*

GAYNOR, C. J., PRESTON and STEVENS, JJ., concur.