JAMES A. NICKERSON, Appellee, v. A. L. WALKER et al., Appellants.

MASTER AND SERVANT: Tools, Machinery, Appliances, Etc.,
1 —"Simple Appliance" Rule—Unequal Opportunity of Master and Servant to Discover Defects. The "simple appliance" rule, to wit, that a master is under no duty to inspect simple or common tools, does not apply when, as to an appliance furnished by the master for use, the servant is not so favorably situated to observe defects as the master.

PRINCIPLE APPLIED: See No. 3.

MASTER AND SERVANT: Tools, Machinery, Appliances, Etc.—
2 Duty of Servant to Inspect. A servant who is under no duty to personally handle, use or employ an appliance may justly assume that it is in a reasonably safe condition.

PRINCIPLE APPLIED: See No. 3.

MASTER AND SERVANT: Tools, Machinery, Appliances, Etc.—
3 Defects—Purchase From Reputable Manufacturer—Effect. The

purchase by a master of an appliance suitable in form for the purpose for which it is to be used, from a reputable dealer or manufacturer, is not *conclusive* evidence of due care. The master will be held to have known of a defect which might have been discovered by such an examination as an ordinarily prudent person ordinarily makes upon the purchase of the appliance in question.

PRINCIPLE APPLIED:  It was no part of the duties of a servant to *harness* a heavy draft horse, but simply to use the horse after it was harnessed.  In compliance with the master's directions, the servant *hitched* the horse to a wagon loaded with lumber, and started to drive it to a shed where it was to be unloaded.  After proceeding a short distance, another servant in some manner hit the horse.  The horse lunged forward, the hame strap broke, the horse pulled through the harness, the servant was jerked from the top of the load and severely injured.  This hame strap had been purchased of a reputable harness maker, who made it on a special order from the master, and had been in use "a few weeks."  It was extra large and wide, being from 1⅛ to 1¼ inches wide, was of ordinary thickness, and was such a strap as is ordinarily used on the harness of a heavy draft horse.  *Concededly, it appeared to be fit and suitable when purchased.*  Concededly, it had been well made.  Expert testimony was in dispute on the question whether this strap had been burned and weakened in the process of tanning, but, concededly, no casual examination by a layman would have discovered such condition from its external appearance.  The maker strongly contended that in its manufacture nothing whatever indicated that the leather was defective.  *Expert* evidence tended to show that the *harness maker* ought to have discovered its defective condition when he made it.  Aside from this conflicting testimony, the leather was probably defective.  *Held:*

(a)  The servant might justly assume that the harness was in a reasonably safe condition.

(b)  The master was under a duty to inspect the strap within the scope of the rule announced above; but

(c)  The evidence showed that he had made such an inspection, and consequently was not negligent.

*Appeal from Black Hawk District Court.*—H. B. BOIES, Judge.

WEDNESDAY, MAY 16, 1917.

ACTION for damages resulted in judgment for plaintiff, from which defendant appeals.—*Reversed.*

*Mears & Lovejoy,* for appellants.

*Reed & Tuthill,* for appellee.

LADD, J.—The copartnership composed of A. L. and W. R. Walker, known as the Walker Lumber Company, was engaged in the retail lumber business in the city of Water-loo. The plaintiff, Chas. A. Nickerson, was in their employ-ment. He testified that, on August 29, 1913, lumber had been sorted and loaded on a low-wheeled one-horse wagon, when one of defendants directed him to hitch the bay horse to the wagon and haul the lumber to the shed where the carpenters were working—that Banks would show him where to leave it. Thereupon, he hitched the horse to the wagon, got on, and, taking the lines, stood on the lumber as he drove, following Banks. The latter, after going ahead some distance, stepped aside, and, as the horse came opposite him, "ran his hammer up and hit the horse on the side. The horse gave a sudden rush in the harness, and I heard a kind of a crash and that was all I knew." One of the hame straps broke, the horse pulled through the har-ness and dragged Nickerson to the ground, seriously in-juring him. Plaintiff alleged in his petition that the hame strap was of poor material, rotten, and that defendants were negligent in failing to see that the horse was prop-erly harnessed, and in failing to furnish a harness with hame strap of sufficient strength so that it would not break. These allegations were put in issue by the answer and sub-mitted to the jury, the court instructing that there was no evidence that defendant knew of any defect in the hame strap; that the burden of proof was on plaintiff to show by a preponderance of the evidence:

"That the hame strap connecting the harness of said horse was so defective as to render it unsafe for use when

used to do the work for which it was intended, and that defendants * * * in the exercise of reasonable care on their part should have known of its defective condition. Upon the question of whether the defendants could in the exercise of ordinary care have discovered and known of the defective condition of said hame strap, if it was defective, you are instructed that the defendants were required to make such inspection or examination of their harness and hame strap as would ordinarily be made under the same or like circumstances by reasonably careful and prudent persons, who were in the exercise of ordinary care on their part, and if you find that the defendants by the exercise of ordinary care would have discovered the defect in the hame strap, if it was defective, then they were negligent in failing to discover the same. But if you find from the evidence in this case that the defect in the hame strap which caused the breakage, if such hame strap was defective, was a latent and concealed defect, which the defendants would not have discovered by the exercise of ordinary care on their part, then they were not negligent in failing to discover the same. The defendants were not insurers of the plaintiff, and were not required to use every possible precaution to avoid injury to the plaintiff, nor to make accidental injury to the plaintiff impossible. But it was the duty of the defendants to exercise ordinary care to furnish plaintiff with reasonably safe and suitable appliances and instrumentalities with which to do the work required of him, and if the defendants failed to exercise ordinary care in that respect, they were negligent. If they did exercise such care, they were not negligent."

Many errors are assigned, and several of these analytically subdivided, but only two are covered by brief points or argument, and these are: (1) That defendant was not proven to have been negligent, and therefore the court erred in not directing a verdict in its favor; and (2) the court

erred in not so doing, for that ,such negligence, if proven, was not shown to have been the proximate cause.

I. Was the evidence such that defendant might have been found to have been negligent? This might have been (1) in furnishing a defective hame strap originally, or (2) in omitting reasonable inspection thereafter, and 'thereby failing to discover the defect which would have been ascertained had ordinary diligence in this respect been exercised. No evidence bearing on the last issue was adduced, and, as the burden of proof was on plaintiff, further attention to this phase of the case is unnecessary. That the master is required to exercise reasonable care in furnishing appliances which, if handled with ordinary prudence, can be used with safety by the employee in the performance of the task assigned him, is elementary law (*Funk v. Leonard Cons. Co.*, 159 Iowa 320), and the question is whether defendant met this obligation. The plaintiff was not required to harness or care for the horse, but merely to handle it after it was harnessed by someone else. The hame straps connect the hames and hold them on the collar above and below, and are tightly buckled, so that casual or ordinary observation, such as a driver would be likely to bestow, would not detect defects such as poor quality of the leather in the strap. This being so, he was not bound to inspect or test the strength or quality of the harness or its parts, but might assume, in driving, that, as a whole, it was suitable for the purposes used. The facts, then, do not involve the simple or common tool rule. That rule rests upon the assumption that the servant is in as good a position to observe any defects as the master, and, for that reason, inspection by the master prior to furnishing the tools is not essential to his adequate protection.

1. MASTER AND SERVANT: tools, machinery, appliances, etc.: "simple appliance" rule: unequal opportunity of master and servant to discover defects.

2. MASTER AND SERVANT: tools, machinery, appliances, etc.: duty of servant to inspect.

*Meyer v. Ladewig,* 130 Wis. 566 (13 L. R. A. [N. S.] 684). Common tools, such as hammer, hand saw, chisel, ladder, and the like, are seen in their entirety in using, and defects, necessarily, are as apparent to the servant in using as to the master on inspection, and, as both necessarily enjoy the same facilities for detecting defects, there is no occasion for one to protect the other. In other words, there can be no difference in knowledge, and for this reason the doctrine of *respondeat superior* does not apply. For collection of cases supporting the above, see *Vanderpool v. Partridge,* (Nebr.) 13 L. R. A. (N. S.) 668; *Sheridan v. Gorham Mfg. Co.,* (R. I.) 13 L. R. A. (N. S.) 687; *Gulf, C. & S. F. R. Co. v. Larkin,* 98 Tex. 225 (1 L. R. A. [N. S.] 944); *Parker v. Wood Lumber Co.,* (Miss.) 40 L. R. A. (N. S.) 832; *Williams v. Garbutt Lumber Co.,* 132 Ga. 221 (64 S. E. 65); 3 Labatt's Master & Servant, Section 924 a.

Here, the defect in the harness was not within the observation of one merely driving the horse, already harnessed, nor likely to be detected by one in the ordinary performance of duties such as devolved upon plaintiff. Only by thorough inspection might he have ascertained the defect, if any there was, in the hame strap. For this reason, as previously said, the common or simple tool doctrine has no application.

3. MASTER AND SERVANT: tools, machinery, appliances, etc.: defects: purchase from reputable manufacturer: effect.

The evidence disclosed that the hame strap was either 1⅛ or 1¼ inches wide, and of ordinary thickness, and was such a strap as ordinarily is used on the harness of a heavy draft horse. It also appeared that it was obtained from a reputable maker of harness, and, because of this, appellants contend that they exercised the degree of care, in furnishing appliances, exacted by the law. All the cases hold that the purchase of appliances suitable in form for the purpose to be used, and of a reputable dealer or manufacturer, is evidence of the

exercise of due care on the part of the master, and, in the absence of other proof, obviates the necessity of any technical test or expert inspection by or for the master. It is strong evidence of the exercise of the degree of care exacted of the employer, and undoubtedly may be conclusive in some instances, and will be prima-facie evidence in others. But where the defect might have been ascertained by an examination such as a prudent person ordinarily makes upon the purchase of a tool or appliance of the kind, we are of opinion that nothing less should be exacted of the master. Certainly, nothing less than this would measure the degree of care and prudence exacted of him. An article may be of approved pattern, and procured of a maker of repute, and yet prove not only defective, but apparently so, on the most casual observation when obtained and before being placed. To relieve the master of the duty of taking notice of what an ordinarily prudent person would observe under like circumstances would greatly impair the doctrine that the duty of exercising ordinary care in furnishing safe appliances is non-delegable. To say arbitrarily that the measure of care exacted is the mere buying of an appliance of approved pattern of a reputable maker, would permit the master, indirectly, in buying, to cast the entire responsibility on the maker. That he has so bought would be a strong and often a controlling circumstance evidencing the exercise of due care, but, as said, notwithstanding this, if the defect would have been observed upon such inspection as persons of ordinary prudence would bestow in buying, the master is bound to see. In other words, as is said in the decisions, this is such a circumstance as will put a prudent man on inquiry, and cast upon him the burden of ascertaining the probable effect of the defect on the safety of his employees. *Parker v. Hailey-Ola Coal Co.,* (Okla.) 40 L. R. A. (N. S.) 1120; *Petroleum Iron Works Co. v. Boyle,* 102 C. C. A. 579; 1 Labatt on Master and Servant (1st Ed.)

327; 26 Cyc. 1139; 4 Thompson on Negligence, Sec. 3990.

The master, notwithstanding so purchasing appliances, owes the duty of such inspection as an ordinarily prudent person, not an expert, would make under similar circumstances. If the defect in machinery or appliances is latent, so as not to be discoverable upon ordinary inspection, the purchaser has filled the measure of care exacted in purchasing of suitable pattern for the purpose, and of a reputable manufacturer or dealer. But if discoverable in the exercise of ordinary care, the master is chargeable with knowledge of the defect, and must suffer the consequences of furnishing such an instrumentality to his employee. A technical inspection, such as might be given by an expert or one engaged in a particular line of employment, is not required. *Deane v. Roaring Fork E. L. & P. Co.*, 5 Colo. App. 521 (39 Pac. 346). As said in *Carlson v. Phoenix Bridge Co.*, 55 Hun (N. Y.) 485:

"A minute examination and test would have detected the latent defect in the iron in this case, yet the institution of such an examination would evidence extraordinary vigilance and caution, and that is not ever exacted from a master in respect to the provision of implements for his servant. * * * There is no conceivable defect which may not be discovered by some possible test. The law is designed for application to the ordinary affairs of business and everyday life. All men are not scientists, and all are justified in acting upon certain assumptions and appearances. * * * We do not test a harness or a wagon which we order from a reputable dealer before we use the same, and there were no circumstances surrounding the manufacture of the hook in question which would induce a prudent man to depart from the usual course of procedure, and adopt special and extraordinary precautions."

On appeal, the Court of Appeals, in 132 N. Y. 273 (30 N. E. 750), added that:

"When articles are manufactured by a process approved by use and experience, and apparently properly finished and stamped, it is not usual for them to be tested again in quality, and such examinations are not generally required by law. * * * All the best iron and steel is made in a few large establishments. The evidence shows that all practicable tests are used during the process of manufacture, and the completed product represents the best article that can be produced. It passes into the hands of dealers, and so reaches the consumer. If the best refined iron is required, the purchaser may assume that the tests necessary to produce that article have been properly made and the work properly done. He must see that the work he undertakes to do is properly performed, but if the tool breaks from an internal defect in the material, not apparent from an external examination of the iron, or in the process of making the tool, the master is no more responsible than he would be if he had purchased it ready made in the market, or if it had broken from an external, apparent defect produced by use, of which he was not chargeable with knowledge."

See *Roughan v. Boston & L. Block Co.*, 161 Mass. 24 (36 N. E. 461); *Allison Mfg. Co. v. McCormick*, 118 Pa. 519 (4 Am. St. 613). All exacted is that the master make such inspection as a purchaser of ordinary capacity ordinarily would make under like circumstances. Such proof of approved pattern and purchase of a reputable dealer or maker is held by some courts conclusive proof of the exercise of ordinary care; by others, prima-facie evidence thereof; and by others, to constitute strong evidence thereof and conclusive, if coupled with proof of such inspection as an ordinarily prudent person, not an expert, would make upon the purchase of a like instrument. Many mechanical instruments are of a character such that any inspection other than by an expert, or tested otherwise than by the

use of facilities possessed at the factory, would be of no advantage, and as to these, the purchaser necessarily relies on the manufacturer to have subjected the instrument to such tests as are necessary to assure safety in its use. A large portion of the decisions declaring evidence of having purchased of approved pattern and from a reputable maker are of this class. Whether the evidence makes out prima-facie proof of the exercise of due care seldom arises, and an examination of the cases sometimes cited as so holding discloses that the point was not touched. See *Nordquist v. Fuller*, 182 Mass. 411 (65 N. E. 834); *Gibson v. Milwaukee Light, Heat & Traction Co.*, 144 Wis. 140 (128 N. W. 877); *Siegel v. Detroit, G. R. & M. R. Co.*, 160 Mich. 270 (125 N. W. 6). We are of opinion that defendant must have made such an examination of the strap as a man of ordinary prudence would have made under like circumstances.

II. The evidence is undisputed that defendant purchased the hame strap of approved pattern and of a reputable dealer, and that defendant directed an employee "to get the best strap that they could get in the shop, and if they hadn't a big, heavy strap, to have one made to order." The employee called on the Western Harness & Supply Company, and informed one of its employees, named Benz, a harness maker of long experience, that "he wanted an extra heavy hame strap for the Walker Lumber Company." Benz testified to having made the strap; that he cut it from the ordinary stock leather in the shop; and that "it was as good stock as I could buy;" that there was no indication of the leather's having been burned or weakened or otherwise injured in the process of tanning, or that it was other than first class leather, or of the particular strap's cracking on the smooth surface.

"Q. You may examine this strap and say to the jury whether, at the time that you made the strap and bent

around this buckle tongue and sewed it down in the way in which it appears, there was at that time any indication of its cracking, even where it was bent around the buckle. A. Well, the leather was all right. If it would crack any place, it would crack in there. Q. In striking it with the hammer there and bending it around the buckle, and there were no signs— A. Of the leather being burnt or cracked, because it would be cracked when we struck it with a hammer and put the buckle in. Q. Did it crack at the time you struck it with the hammer and bent it around there and sewed it down? A. No, sir, if it did it would show there. There are some slight cracks there now; but they were not there at the time. Even good leather will sometimes crack when we bend it around a buckle like that and strike it with a hammer for the purpose of flattening it down. That is, if the blow from the hammer in flattening it down for the purpose of sewing it is unusually hard, or a hard blow, or something like that, it may crack the leather where the bend is. And the fact that it does crack a little at the surface where the bend occurs, is no indication that the leather is poor, or in any manner injured by tanning or otherwise. Surface cracks on the hard or smooth side upon bending is caused a great many times by being too dry, by being kept in a dry place."

The evidence tended to show that the Western Harness & Supply Company purchased only first class material. Allen testified to having had long experience as harness maker, and that, in making hame straps for draft horses, the leather should be "good, solid, firm leather. It shouldn't be leather that is breakable; should be firm, pliable leather." He was shown the two pieces of the broken strap, and expressed the opinion that the leather was not the kind of leather ordinarily used in making hame straps for draft horses, and, on cross-examination, explained that, in what he had said, he had had reference to the way it had been

dressed or tanned; that it seemed to have been burnt in tanning; that whatever material had been used in tanning had rendered it "hard and brittle and easy to crack and break. This would be apparent when it was a new strap first put out of the shop; often they crack on the grain when you bind the strap. Still, a slight crack on the grain don't always injure the leather materially. Leather, when being bent strongly, may show a little surface crack on the smooth side and still be good leather. The condition of the leather produced by the tanning material being too strong, so as to burn it, would be apparent when the leather was new."

The witness testified further that the strap was extra large and wider than the standard by a quarter of an inch; that—

"There isn't anything defective or wrong about the way the strap has been made. It is made properly and good and strong in every way, shape and manner. The only thing wrong is the manner or way in which it was tanned, which in some way has burnt it or weakened it. Q. But the point is that, just looking at it without testing it to see that the tanning was all right, it wouldn't be apparent; that is, you couldn't have taken that strap when it was new and first made, and by just looking at it in a casual way determine there was anything wrong with the tanning, could you? A. No. Q. In other words, it would require more or less of an expert examination to determine that there was anything wrong with it, wouldn't it? A. When the strap was made, the man that made it and the one that cut it out and examined that strap as he cut it should have known."

Lee, who also was of long experience, testified that there was "nothing the matter with the leather (in the strap) except that it was burnt in tanning. I think from my examination of the strap now that the condition in which I

find the strap's surface was produced by the tanning material;" that—

"By bending it, you could see it was cracked; that is the way that you do, you know, with a hame strap, to see whether it is a good piece of stock in the hame strap. That is the ordinary way that an expert, a harness maker or a man in the business, would tell. I don't know whether you would, but a man who knows—why, that is about the first thing he would do with a strap, to bend it to see if the grain had been burnt, or if it was all right, in that manner. Q. There wouldn't be anything about the appearance of the leather in ordinarily looking at it, without applying this bending test, to indicate that it wasn't all right? A. No, sir."

Thus far we are without evidence that the hame strap had any defect other than such as would be discovered by an expert. Shortly after the accident, defendant exhibited the pieces of strap to plaintiff's son, who, according to A. L. Walker, exclaimed: "That looks like a mighty good one;" but this the son denied. He had been a farmer and accustomed to handle horses and harnesses, had noticed hame straps ordinarily used on harness for draft horses, and testified concerning the strap in controversy that "it was a new strap, cut from new leather, but it was spongy. It was cracked when you bent it, as though it hadn't been tanned right, or something. I don't know anything about that, but it would crack, nevertheless." The witness did not point out in what manner the leather appeared different from that ordinarily found in harness, nor what bending was necessary to make the leather crack, nor the character of the cracks made. The testimony of this son, then, did not furnish data on which to base a finding that the condition of the strap was such as to warn an ordinary user of harness that it was defective, nor was it pretended by the witnesses Allen and Lee that persons

other than those skilled in testing and inspecting leather would be likely to discover that the leather in the strap had not been properly tanned. Bearing in mind that defendant had the right to rely upon the maker's having made such tests or inspection as were essential to ascertain whether this strap was of the quality exacted for the purpose used, and that the purchaser was not required to give it an expert examination or test, and was required to make only such examination as a purchaser in the exercise of ordinary care would make under like circumstances, could the jury properly have found, from the evidence referred to, that defendant was negligent in not discovering that the strap was of defective quality and not of sufficient strength for the purposes used? A careful examination of all the evidence has convinced us that this inquiry must be answered in the negative. The witnesses Allen and Lee thought the lapse of a year would make little difference in the strap, while three experts called by defendant testified that leather in stock was generally kept in cool places in order to prevent it from drying out; that heat dries the oil out and renders leather brittle. In answer to hypothetical questions, reciting that the leather had been in a desk near a coal burner since shortly after the accident (as to which the evidence was without conflict), these witnesses said leather would dry out so that the surface would crack, and that, from looking at the pieces of this hame strap, there was nothing about them to indicate that the leather was injured or weakened in the process of tanning.

Undoubtedly, the strap might have been found to have been defective in quality, for that it probably would not have broken after only a few weeks' use, the evidence being that it should have lasted for years. But this was not a necessary conclusion, for the horse was heavy, the start sudden, and the strain on the strap may have been so applied as that it broke, when, but for the peculiar situation,

it might have held. And, too, there was no showing as to the manner in which such straps ordinarily are inspected by others than expert harness manufacturers and tanners. It would seem that about all that ordinarily would be done would be to observe the external appearance of the strap, and possibly draw it through the hand to ascertain if it were pliable. Surely, it cannot be assumed without evidence that a non-expert, in the exercise of ordinary care, would sharply bend the strap and search for cracks on the surface, before making use of it, to test its strength. The evidence that it appeared suitable for the purpose bought when procured of the maker is undisputed, and we are of the opinion that the evidence did not disclose any neglect on the part of defendant, and a verdict should have been directed accordingly.—*Reversed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.