Ed Rehard, Appellant, v. B. B. Miles et al., Appellees.

No. 44457.

March 14, 1939.

Opinion on Rehearing March 12, 1940.

Daniel J. Gallery, for appellant.

George J. Dugan and Percival & Wilkinson, for appellees.

HAMILTON, C. J.—This is the second time this case has been before us. At the March 1939 period, a reversing opinion was filed. See 284 N. W. 829. A rehearing was granted and the case reargued and again submitted and the court, upon reconsideration, having concluded that the decision of the trial court should be affirmed, the former opinion is withdrawn and this opinion substituted therefor.

The silo was about 45 feet high and 12 feet in diameter, and was composed of concrete staves held together by steel hoops which encircled the silo. The derrick, which was placed inside the silo, was suspended from a steel center pole about 5 inches in diameter composed of a number of removable sections each of which would telescope 2½ feet into the next section. The base of the platform was similar to a large wheel. The hub of this wheel was fitted around the center pole and the spokes or arms which radiated from the hub were adjustable to fit

the silo. Upon these arms was laid a wooden platform conforming to the circle of the silo with an open space in the center of the platform.

At the start of the work this platform was raised to a place near the top of the silo and it was gradually lowered as the work of removal progressed. It was supported by chains which were fastened to each of its arms and which extended to the center pole where there was a hoist by which the hub and platform could be moved up or down the center pole. When these chains were not supporting the platform, it was held up temporarily by two steel pins or pegs 14 inches in length and 5/8 inch in diameter which were inserted in holes in the center pole and upon which pins the hub rested. Each time the platform was lowered a few feet, it was necessary to remove a section of the center pole above the platform. To accomplish this, the chains were unfastened and the hub permitted to rest upon the steel pins. Then the section of the center pole was removed with the aid of a man who operated the ropes of a pulley while standing on the ground under the platform. When the section was removed the chains were again hooked to the arms of the platform which could then be lowered for the convenience of the workers to a point where the next lower section of the center pole would telescope together. At that point it would be necessary to again unhook the chains supporting the platform and repeat the operation of removing the section. During each of these operations the only support for the platform was these two 5/8-inch steel pins upon which the hub rested and which prevented the hub and platform from sliding down the center pole to the ground. However, while work was actually in progress, it was "aimed" to carry the weight on the hoist.

At the time in question the platform was about 20 feet above the ground, on it were two men, 45 or 50 cement staves weighing about 30 pounds each, and the chain's hoist. The weight of the loaded platform and hub was more than a ton. They were preparing to remove a section from the center pole and the chains had been removed. Although the hub and platform were supported only by the pins, it appears that some work was then being done upon it.

Appellant was working outside the silo, piling slabs. John-

son, who owned the equipment and who apparently was directing the work, called down to the men below to give a pull on the rope used to take off the section of the center pole. Appellant stepped into the silo through a small door in its base and had just taken hold of the ropes of the pulley and had given the rope a pull or was in the act of doing so when the loaded platform fell upon him. The fall of the platform was caused by the bending down of the steel pins into a V shape so the hub slipped down over them and down the center pole.

At the close of plaintiff's evidence, a motion to direct a verdict based upon a number of grounds was sustained upon two propositions, first that appellant had failed to prove negligence on the part of the defendants, and, second, that he assumed the risk in going under the platform, and judgment was entered against plaintiff from which this appeal is taken. It may be said here that while the evidence as to the connection of appellee, Orris, with the transaction is fragmentary and uncertain, it is apparently conceded that both appellees are in the same legal position. No propositions are argued other than as above noted. In passing upon the sufficiency of the evidence to warrant the submission of the case to the jury, it must be viewed in the light most favorable to appellant.

The nature of the question necessitates our setting out and considering the evidence bearing on the question of negligence. Plaintiff's case is based on the theory that Carl Johnson, who owned the equipment, was a vice-principal of the defendants; whereas, the defendants contend that Johnson was a fellow employee of the plaintiff and other laborers engaged in the work of taking down the silo. We think it is doubtful whether Johnson may be properly classified as a vice-principal under our prior holdings; however, it does not seem necessary to pass upon this proposition further than to say that, in so far as the actual work or labor in operating the equipment and removing the slabs and hoops in the process of taking down the silo is concerned, Johnson was engaged as a co-laborer with the other men employed. In other words, if he was a vice-principal in any respect, he was such only as to the matter of furnishing proper equipment and a safe place for the laborers to work. While it may be said he was directing the work, this in and of itself under our holdings would not constitute him

1294

a vice-principal, for, as stated in Newbury v. Manufacturing Co., 100 Iowa 441, 448, 69 N. W. 743, 745, 62 Am. St. Rep. 582:

"We have frequently held that the mere fact that one employe has authority over others, does not make him a vice-principal or superior, so as to charge the master with his negligence. Peterson v. Mining Co., 50 Iowa, 673 [32 Am. Rep. 143]; Foley v. Railway Co., 64 Iowa, [644] 650 (21 N. W. Rep. 121); Benn v. Null, 65 Iowa, 407 (21 N. W. Rep. 700); Baldwin v. Railroad Co., 68 Iowa, 37 (25 N. W. Rep. 918); Hathaway v. Railway Co., 92 Iowa, 337 (60 N. W. Rep. 651). * * * *if the act is one which pertains only to the duty of an operative,* the employe performing it is a mere servant, and the master is not liable to a fellow servant for its improper performance." (Italics ours.)

Turning now to the record, we find that Miles, a resident, of Chicago, Illinois, engaged in the business of selling cattle, owned a farm in Dallas county, Iowa, and also a farm in Madison county, Iowa. Orris lived on the Madison county farm as the tenant of Miles. Miles purchased two silos in the neighborhood and asked Orris to have them taken down and moved onto his farms—one to the Madison county farm and the other to the Dallas county farm. He did not tell Orris how to do it or what to do. Carl Johnson, who lives in Winterset, Iowa, and is a farmer, owned an apparatus for erecting and taking down silos. He acquired it from his father in 1921 and had used this equipment on approximately eight different silos. John Kale had previously owned and operated the equipment since about 1914. Kale built as high as 20 silos in a single year around Madison county. The equipment was standard equipment for that purpose. The pins used, according to Johnson's testimony, were of the best material he knew of that he could get for that purpose. The pins were made from steel hoops which were used around silos and the steel was a little harder steel than that ordinarily used by blacksmiths. So far as Johnson knew, the platform had never fallen or slipped down over the pins at any other time or place. The equipment was being operated in the usual and ordinary way on the day of the accident just as it had always been used and operated. Johnson was an experienced operator. There is no claim to the contrary. The rule of law is that a master is required to exer-

cise reasonable care to furnish reasonably safe tools, appliances and instrumentalities for use in the work which the servant is expected to perform and the same degree of care in furnishing a reasonably safe place in which to work. Degner v. Anderson, 213 Iowa 588, 239 N. W. 790. In no event is the master held to warrant or insure the servant's safety, but he is held to the exercise of reasonable care to eliminate those elements of danger to the life and limb of the servant which are not the usual and natural incident of the service when the master has exercised reasonable care. That is, it is an implied term of the servant's contract of employment that he assumes the risk which naturally pertains to his work, but he is under no contract or legal obligation to assume any risk which is occasioned by a failure of duty on the part of his employer. Swaim v. Chicago, R. I. & P. R. Co., 187 Iowa 466, 476, 174 N. W. 384. If, in the performance of these duties, the master has exercised that degree of care ordinarily exercised by other reasonably prudent persons, acting under the same or similar circumstances, he has met the standard of care the law requires and it cannot be said that he is guilty of negligence.

Applying this rule of law to the conduct of these defendants, wherein can it be said they failed to exercise due care in the employment of Johnson or in the use of the equipment?

There is no claim that it was out of repair or any of its parts were defective or that there exists any better equipment. It had been in use for many years as standard equipment. This is true without any contradiction or exception as to everything other than the pins that were used. As to the pins, the evidence is that they usually had different pins on each job. The contention is made—and it is on this point mainly that the whole case hinges and is the chief bone of contention—that these pins were not inspected. Just what is meant by this is not very clear. It is true the tensile strength was not tested by any mechanical device, that is they had not been previously placed through an experimental test scientifically administered by an expert. They had been tested by actual use on this job for the platform had been lowered about five times and every time it was lowered the weight of the platform had to rest on the two pins through the center pole. If by inspection is meant that they were looked at and examined,

then they were inspected for Johnson testified that he saw the material and it was the best he knew of for the purpose; that it was harder steel and, hence, would be less flexible and less liable to bend than the steel that blacksmiths ordinarily use. The holes through the center pole were not large enough to accommodate any larger sized pins, hence, pins of this dimension necessarily had to be used and, therefore, we conclude had been used on all previous occasions, successfully. If this test or inspection of a simple piece of steel does not meet the rule of ordinary care in the selection and use of the pins, then a farmer, in order to be protected against liability to an employee, would have to engage a scientific expert and have every bolt or rod in all his farm equipment put to a scientific test before he would be warranted in making use of the same in any and all of his farm operations—making hay, filling silos, harvesting his crop and in any of the other various and numerous farm operations in which simple bolts and rods, chains and clevises and all other steel or other kind of connections and appliances, used in the construction and operation of farm machinery, are made use of. Such a rule is entirely unwarranted. Therefore, we conclude that this accident cannot be charged to any negligence due to the equipment.

When we turn to the other phase of the matter, namely, improper or negligent use, such as lowering and raising the platform or in removing the sections of the center pole—whether the laborers were careful or whether the laborers used due care in manipulating the equipment—we find ourselves confronted with the fellow servant rule and, while it is a mere matter of conjecture under this record, it is in this field that the only suggested explanation of the cause of the accident is to be found; no one can read the record without coming to the conclusion that the accident must have been due to some carelessness of the men; either this platform had been overloaded with slabs or blocks of concrete or else had not been let down properly and securely on the pins before undertaking the task of removing the joint from the center pole, and, but for such negligence, the platform would not have fallen and there would have been no accident for the same equipment had been in use too long without experiencing any difficulty to warrant any other assumption.

This same bunch of men had just finished the work of taking down and re-erecting the silo over on the Madison county farm and had lowered the walls of the 45-foot silo that they were working on at the time of the accident down to within 20 feet from the ground, moving the platform five times without any difficulty, and, after the accident, then resumed the work with the same equipment. When we turn to Mr. Johnson's testimony and analyze the same, touching the matter as to how this accident might have occurred, it bears out what we have just said. Johnson had explained that there were places for these pins every 2½ feet and that, in lowering or raising the platform as the work progressed, the scaffold would swing from the hoist attached to the top of the pole and during that process the pins would not be in the center pole, but, when the platform was lowered and the pins reinserted, he said:

"* * * whenever we could we always aimed to lower the platform down so the pins and hoist both held when we were working on the job."

When they quit work on Saturday afternoon preceding the Monday morning on which the accident occurred, they had taken off the slabs down to where it was necessary, before doing any more work, that the platform be again lowered, and Johnson testified that, when they quit work Saturday afternoon, that:

"It [the platform] would be resting awful close to the pins, might be part of the weight on the hoist, always aimed to carry the weight on the hoist. There would be some weight on the pins.

"Q. What do you understand caused it to fall? A. Well, I don't know whether there was anything there that might have held this platform off the pins or not. If there was something there and the thing was not lowered substantially on the pins there might have been a drop there of an eighth of an inch or something like that, causing them to bend over. I don't know."

Aside from the fact that the platform fell due to the pins bending down, there is no other theory advanced by any witness except the conjecture found in the testimony of Mr. Johnson just quoted as to why or what caused this platform to

fall. At the time it fell, the hoist had been removed from the center pole. The rope was attached to the top joint of pipe. Johnson and one of the other laborers were up on the platform. Johnson called down, without using anybody's name and simply said:

"Give a pull on the center pole."

Plaintiff was working on the ground, went through a little door at the base of the silo, took hold of the rope and had either started to pull or was in the act of doing so when he heard the platform give way; he started to get out, but did not make it. If this platform was overloaded by the fellow servants of the plaintiff or if, in lowering the platform preparatory to removing the hoist, they did not use due care in seeing that the hub rested securely down on the pins so that it would not slip or drop, as suggested by Johnson in his testimony, and because of such want of care the accident occurred, then, the plaintiff's injury would be due to the negligence of his fellow servants for which the master is not liable. It is obvious that, in performing a piece of work such as this, elements of danger exist as is true in much of the work done by human hands, especially on a farm; such dangers are naturally incident to the work even when the best of care has been observed in the selection of men and equipment; just a slight oversight of one of the workmen, such as is suggested by Johnson, might have been true of failing, for some unaccountable reason, to get the weight of this heavy platform down securely on the pins, and, while, in this position, the hoist was removed and the movement of the men on the platform caused it to drop an eighth of an inch, bending the pins—a thing that had never occurred before, one of those unexpected events that happen in the experience of life which it seems impossible to adequately guard against and which necessitates the rule of law which says an employer is not an insurer of the absolute safety of the employee.

This record does not present a case of a hidden danger known to the employer and unknown to the employee, requiring the employer to warn the employee. Plaintiff's testimony discloses that he was familiar with the way and manner the work was being done and the methods used in operating the apparatus. He had worked on the other job. He had inspected

the pins used. He said he had felt the pins were not strong enough, but admitted he never expressed his fears to anyone. With such misgivings, he, nevertheless, voluntarily placed himself in the position of danger should these pins give way. We say voluntarily in the sense that he was not under the domination of Johnson or anyone else on the job. Neither of the defendants was present and neither of them had assigned to him any particular duty. Johnson did not hire plaintiff and had no power to fire him. It was as much plaintiff's duty as any of the other workmen, if he sensed danger, to speak up and call it to the attention of the others. The two men on the platform were in a perilous position also, if there was something apparent to plaintiff that might cause the platform on which they were working to fall; plaintiff, looking up from beneath the platform, was in a better position, apparently, to see the pins than his fellow workmen on the platform.

We hesitate to say that one so seriously injured may not recover, but considerations of sympathy do not warrant the court in establishing an unsound principle of law. The case must be and is, accordingly, affirmed.—Affirmed.

STIGER, RICHARDS, MILLER, and MITCHELL, JJ., concur.

OLIVER and BLISS, JJ., dissent.

OLIVER, J. (dissenting)—I respectfully dissent. The record shows appellees left everything in the hands of Johnson, reserving no discretion or control to themselves. He had full charge and control, gave all orders and superintended the work.

Appellant is entitled to the benefit of the most favorable view of the evidence rule. Johnson testified:

"I told him [Ed Rehard] to go in and help Snelson take off this section of the center pole."

Considering the record in the light most favorable for appellant I think there is no justification for the conclusion reached that he was not working under the orders and domination of Johnson or that he voluntarily placed himself in a position of danger or that he was under any duty to inspect the pins which supported the platform. Appellant was a common laborer and was working on this job as such. His place of work was on the ground, not upon the derrick. There is evidence

that he was familiar with the equipment, although he did not know how it was lowered. He looked at the pins used on another job but it does not clearly appear that he had inspected these particular pins. As he crawled through the small opening in the bottom of the silo he looked up but could not see whether the platform was then resting on the pins.

The duty of inspection is the duty of the master and not that of the servant. The master and the vice-principals have the duty of making and continuing inspection. Warner v. Spalding, 186 Iowa 137, 172 N. W. 263. Nor may the master delegate his positive duty to furnish reasonably safe equipment and a reasonably safe place to work. Wilder v. Cereal Co., 134 Iowa 451, 109 N. W. 789; Parkhill v. Van & Storage Co., 169 Iowa 455, 151 N. W. 506; Hartshorn v. Mardis Co., 165 Iowa 454, 146 N. W. 70; Correll v. Williams & Hunting Co., 173 Iowa 571, 155 N. W. 982, Ann. Cas. 1918A, 117; Johnson v. Minneapolis & St. L. R. Co., 183 Iowa 101, 165 N. W. 51.

Nor is the right of recovery of an injured employee barred by the negligence of fellow servants which may have combined or co-operated with the negligence of the master in failing to furnish a reasonably safe place to work or reasonably safe equipment. Gordon v. C. R. I. & P. Ry. Co., 129 Iowa 747, 106 N. W. 177; Kroeger v. Marsh Bridge Co., 138 Iowa 376, 116 N. W. 125; Huggard v. Refining Co., 132 Iowa 724, 109 N. W. 475; Donnelly v. Cement Corp., 168 Iowa 393, 148 N. W. 982.

The immediate cause of the accident was the bending down of these two ⅝-inch steel pins, which supported the heavy platform. These particular pins were first used on this job. There was no claimed defect in the machine other than in these pins. It does not appear by whom or how the pins were made, or that they were ever inspected. They were made from used steel silo hoops furnished by appellee Orris, which apparently had been exposed to the weather for an indefinite time. Johnson, who was not shown to have had any particular knowledge of metals, testified that they were of the best material he knew of and the steel was a little harder than that ordinarily used by blacksmiths. Assuming Johnson knew the hardness of steel ordinarily used by blacksmiths, there is nothing in the record to

show the meaning of this expression or that the material used was sufficient and proper for this particular purpose.

The majority decision accepts this as sufficient compliance with the standard of care required for the supports for a platform under which men were ordered to work. I do not agree that the making of these pins from this scrap metal by some unidentified person in an undisclosed manner so conclusively establishes the exercise of the care to furnish reasonably safe equipment positively required of the master, as to warrant the direction of a verdict upon that ground. Bell v. Brown, 214 Iowa 370, 239 N. W. 785.

The decision concedes that the tensile strength of the pins was not tested and suggests the difficulty of testing them before they were used. In this case the probable results from the failure of these pins were serious. Therefore, there was a definite duty to test them. Appellees might have been excused from the duty of testing these pins had they been secured from the manufacturer of the derrick, or other reputable manufacturer who specialized in making such pins. But it does not follow that this excuse would apply to pins made by anyone from anything. Nickerson v. Walker, 179 Iowa 1281, 162 N. W. 768.

The decision states the pins had been tested by actual use on this job. To say the least, this was a unique method of testing equipment upon the tensile strength of which human safety depended. The fact that the second-hand material withstood the strain temporarily does not prove that it was safe or had sufficient strength to properly perform its functions. Nor would the fact that other pins had not failed prove the strength of these defective pins as a matter of law.

I am unable to determine with certainty whether or not the decision is based in part upon the theory that appellant assumed the risk of injury by obeying the orders to work under the platform. If this is the holding, I think it is contrary to a long line of previous decisions and code section 1495. Bell v. Brown, 214 Iowa 370, 239 N. W. 785; Oestereich v. Leslie, 212 Iowa 105, 234 N. W. 229; Bruns v. Northern Brick & Tile Co., 152 Iowa 61, 130 N. W. 1083; Nelson v. Smeltzer, 221 Iowa 972, 265 N. W. 924.

I think the case was for the jury.

Bliss, J., joins in this dissent.