W. H. SAMPLE, administrator of estate of JOSEPH WAUGH, appellant, v. OTTO SCHWENCK, appellee.

No. 48100.

(Reported in 54 N.W.2d 527)

1190

JULY 28, 1952.

REHEARING DENIED SEPTEMBER 19, 1952.

Jaqua & Lovrien, of Humboldt, for appellant.

Rider & Bastian, of Fort Dodge, and Garfield, Baker & Miller, of Humboldt, for appellee.

SMITH, J.—Plaintiff's intestate, Joseph ("Little Joe") Waugh, was a farm employee of defendant. He was killed August 2, 1950, when a granary fell on him as he was helping to raise it.

Plaintiff seeks damages for his death, alleging, in four specifications, defendant's failure to provide a safe place to work, reasonably safe tools and equipment, adequate support for the board upon which the jacks were set and supports and braces sufficient to prevent the building from slipping off the supports. In a second count plaintiff alleged general negligence relying on the doctrine of res ipsa loquitur.

The trial court, at the close of plaintiff's evidence, directed verdict for defendant holding plaintiff had failed to prove any of the specific allegations of negligence and that the doctrine of res ipsa loquitur did not apply. The correctness of this ruling is the question here.

■ I. Count I of plaintiff's petition seems to have been drawn with section 88.14, Code 1950, in mind to preclude any defense of assumption of risk or waiver of defendant's negligence by plaintiff's intestate. The trial court, on plaintiff's motion, struck such defense from the answer. No complaint is made here of the ruling. Nor is any defense of contributory negligence involved as it could only be pleaded in mitigation of damages. Rule 97, Iowa R. C. P.

■ The evidence was without material conflict. Giving plaintiff the benefit of every legitimate presumption and inference we must conclude with the trial court that it was insufficient to go to the jury on Count I.

Defendant's farm where the injury occurred was being operated by one Corwin Dudley who seems however not to have been present the day of the accident. The granary was approximately 18 or 20 feet long east and west by 10 feet wide, and was empty. Apparently the purpose was merely to raise it a little, clean out a considerable accumulation of debris—oats

and oat hulls worked over by rats—and possibly to reorient it somewhat.

Defendant and another employee, Everett McCabe, commenced the work the afternoon of August 1, the day before the accident. Decedent-Waugh joined them the second day. The west end of the building had by that time already been raised and pushed from the south with jacks. Defendant had borrowed two pump jacks and himself owned a small screw jack. Old-fashioned discarded railroad ties—hewn, not·sawed—were used for blocking.

At the time of the injury (between two and three o'clock p.m.) McCabe had taken the tractor over to the elevator, about a quarter of a mile away, for more ties. When he was over there with Frank Asa, who lived in the elevator tenant house, Mrs. Dudley, wife of defendant's tenant, drove up to them hurriedly and told them "Little Joe" was caught under the granary. They hurried over to the scene and found defendant trying to get the building raised enough to release him. He was caught under the south edge of the building at or near the southeast corner.

We have only the testimony of Asa and defendant as to the situation, as neither McCabe nor Mrs. Dudley was called by plaintiff. Waugh lay with head toward the west, his right arm and leg and right side of the body under the edge of the building.

Defendant himself, as plaintiff's witness, gave the more connected and detailed account of the operation and situation up to and at the time of the tragedy:

"The three of us worked all morning on that building. * * * we raised the [east] end and we dug out, raked out oats and oat hulls from the south side and some from the east end and * * * north side. * * * we used a long-handled shovel. All three of us did some of that work. The sills under the building were 6x6, the length of the building. There was no foundation * * * other than the sills. There were two sills * * * about a foot and a half in from the sides. There were [2x6] stringers above the sills and the floor onto that. * * * The debris * * * filled the space pretty well from the bottom of the stringers up to the floor. * * * Rats had been working there, that was one of the reasons

for raising the building. We got the east side [end] * * * raised. We placed the jacks * * * right next to the sills * * * against the plate that goes around the building * * * below the stringers.

"I think we used three jacks * * *. We raised the east end all at once gradually. * * * We started the building on the southeast corner and raised it with a screw jack first, then we blocked it and put one of the bigger jacks under it. We then went ahead and started over to the northeast corner. * * * We had the bigger jacks located one at the north side of the east side [end] * * * and one toward the south side * * *. We had two-inch wood pieces under the jacks. They were about eight inches wide and a couple of feet long. When we raised the building the jacks pushed the pieces of wood down very little. We continued to raise the building * * * until we got what we thought was level. We did not put any bracings or blocking under the east side * * *. One of the jacks under the east side * * * went over as the building went over. * * * We did not have any blocking under the east side * * *. I sent Mr. McCabe over to the elevator to get more ties. * * * the east end of the building was standing on two jacks. * * * Joe Waugh and I were there when McCabe left. Just before the granary fell I was on the east side of it sawing a tie in two or just finished. I was facing the northwest * * *. I think it went straight down."

On cross-examination defendant said:

"The building was raised about fourteen inches above the level of the ground. We were going to put the ties under the south wall first. The ties were to be pushed under the side * * * so they would either be flush with the siding possibly in an inch or something like that * * * lengthwise with the side of the building."

Also: "We were cleaning out under the building back about a foot and a half. * * * We had moved the west end of the building about three feet. We had not moved the east end at all. We had not had any trouble prior to the accident with the building sliding off the supports. * * * I never told Mr. Waugh or Mr. McCabe to go under the building for any purpose. I told them several times not to go under * * *. We had a discussion about

the matter and the dangers of going under the building. From where I was on the east end * * * I could not see Waugh on the south side of the building. * * * Just before the accident happened Mr. Waugh said 'I believe I see a package of cigarettes under there' and he had no more than got it out of his mouth than down the building came. I believe it was practically on the way down * * *. It made a little noise * * *. I think I saw [it] kind of jiggle or shake like and I immediately went around where Joe was."

There is no evidence decedent uttered any word or sound after the building went down. Pictures taken the day after the accident and before there was any change in the situation show the southeast corner of the building resting on the ground and the other corners on blocks. The southwest corner was not quite as high as the northwest one.

Asa testified: "The jack under the east end had been tilted, tipped—I wouldn't say which way, but it had been supporting the building and it had slid or skidded or something." There is no testimony showing why this one jack tipped. The evidence shows the soil around the building was not loose. They had to dig holes to work the jack handles to get the building started. The deputy sheriff who visited the scene the next day testified: "The jack that was near the southeast corner was leaning towards the north * * *. It was setting on a board under the building * * *. It [the board] must have been about three feet or so long and about two inches thick." On cross-examination he said the jack was not a screw jack.

Defendant testified they discarded some ties as unsuitable for blocking. The condition of those actually used is not shown nor is there any showing of any defect in the jacks.

II. Plaintiff in argument says "the trial court seemed to be of the opinion" there should have been "some expert testimony that the manner of raising and blocking the building was not proper." The plaintiff then proceeds to argue that such an operation on an Iowa farm was not the subject of expert testimony, being usually performed by farmers and their employees without calling in professional movers. Assuming that to be correct the argument becomes something of a two-edged sword. If it was an

amateur job the mere use of amateur tools and equipment could hardly be considered negligence.

Plaintiff also argues the railroad ties "were uneven, rounded on the edges, and not such blocking as a reasonable and prudent employer would use for supporting a building." The evidence however shows quite clearly the accident was not due to use of defective ties. The pictures show the building still blocked under the three corners which had been blocked. The one corner that was down had been temporarily left on the jack awaiting Mc-Cabe's return with more ties.

If it be assumed the failure of the jacks to sustain the load was due to some hidden or latent defect in the instrumentality itself, defendant would not be liable unless there was a showing he knew or in the exercise of reasonable care should have known of it. 56 C. J. S., Master and Servant, section 247. See Bergman v. Altman, 127 Iowa 693, 104 N.W. 280.

Plaintiff says the jacks were set "in loose dirt that had been worked by rats." But this is not the record. The rats had worked *under* the building. The soil *around* it was not loose. There is no evidence the jack went down in loose dirt. It was still on the two-inch block. Plaintiff's argument must finally narrow down to the one criticism—failure to place temporary blocking or side supports while McCabe brought more ties from the elevator a quarter of a mile away.

We cannot hold this constituted evidence of actionable negligence. Defendant, as a reasonably prudent person, could not have anticipated the accident that happened. The situation must have been known to all as merely temporary.

Plaintiff cites some eight Iowa cases on the question of the employer's negligence. As to practically all of them it is conceded they are "not on all fours." In those in which a jury question was held to have been generated some known defect in the appliance or tool or machine, or some specific act or omission constituting negligence, was pointed out: Oestereich v. Leslie, 212 Iowa 105, 108, 234 N.W. 229, a defective clutch on a tractor plaintiff was required to operate; O'Reagan v. Daniels, 241 Iowa 1199, 44 N.W.2d 666, a defective hay rope with a tendency to twist, kink and jam requiring the operator to assume a dangerous

position, in which he was injured; Bell v. Brown, 214 Iowa 370, 239 N.W. 785, a tractor with alleged inadequate and defective appliance for throwing it out of gear; Brodd v. Crile, 185 Iowa 412, 170 N.W. 740, negligence of the employer to screw the clevis pin securely into the clevis on a power lever of a stump puller, the only question being whether defendant-employer or plaintiff himself hitched the team that day; Murray v. Daley, 164 Iowa 612, 146 N.W. 451, an unguarded dangerous mechanism concerning the danger of which plaintiff's intestate, an unskilled worker, was not properly warned; Johnson v. Kinney, 232 Iowa 1016, 7 N.W.2d 188, 144 A. L. R. 997, an unguarded revolving shaft; Cable v. Fullerton Lumber Co., 242 Iowa 1076, 49 N.W.2d 530, negligence of driver of defendant's truck in operating it.

Plaintiff also cites Anderson v. Sheuerman, 232 Iowa 705, 6 N.W.2d 125, and Rehard v. Miles, 227 Iowa 1290, 290 N.W. 702. In both these cases the action of the trial court in directing verdict was affirmed.

In the Sheuerman case plaintiff was operating a "burner"— a device contrived for burning leaves. A grass and leaf fire became started outside the "burner" and in fighting it plaintiff's clothing caught fire and he was injured. The opinion says:

"It is well settled that a master must exercise reasonable care to furnish his servant safe and suitable tools and appliances for his work. This duty is similar to the employer's obligation to furnish the servant a reasonably safe place to work. The master is not an insurer of the servant's safety but he must exercise reasonable care to eliminate those dangers which are not the usual or ordinary incidents of the service when the employer has exercised ordinary care.

"The servant assumes the risks that naturally pertain to his work but is under no obligation to assume any risk caused by the master's failure of duty. Swaim v. Chicago, R. I. & P. R. Co., 187 Iowa 466, 477, 478, 174 N.W. 384, certiorari denied, 252 U. S. 577, 40 S. Ct. 344, 64 L. Ed. 725; Rehard v. Miles, 227 Iowa 1290, 1295, 290 N.W. 702; 35 Am. Jur. 604, 605, sections 175, 176." 232 Iowa at page 708 et seq., 6 N.W.2d at page 127.

Rehard v. Miles, supra, was an action by a workman against

his employer for injuries caused by the falling of a derrick being used in tearing down a silo. The details are unimportant here. The court said (227 Iowa at page 1295, 290 N.W. at page 704):

"In no event is the master held to warrant or insure the servant's safety, but he is held to the exercise of reasonable care to eliminate those elements of danger to the life and limb of the servant which are not the usual and natural incidents of the service when the master has exercised reasonable care. That is, it is an implied term of the servant's contract of employment that he assumes the risk which naturally pertains to his work, but he is under no contract or legal obligation to assume any risk which is occasioned by a failure of duty on the part of his employer. Swaim v. Chicago, R. I. & P. R. Co., 187 Iowa 466, 476, 174 N.W. 384. If, in the performance of these duties, the master has exercised that degree of care ordinarily exercised by other reasonably prudent persons, acting under the same or similar circumstances, he has met the standard of care the law requires and it cannot be said that he is guilty of negligence."

See also Jacobson v. United States Gypsum Co., 144 Iowa 1, 8, 120 N.W. 651.

We are persuaded there is no evidence here sufficient to support any of the specifications of negligence. In the progress of work of this kind there would naturally be temporary intervals of danger that could not be guarded against except by alertness of the men for their own safety. See 56 C. J. S., Master and Servant, section 249: "A master is not bound to provide a safe place where the work on which the servant is engaged is such as to render the place where it is done temporarily insecure." A similar rule or exception relates to cases involving changing conditions as the work progresses. See notes 19 L. R. A., N. S., 340 and 28 L. R. A., N. S., 1267. In the former the editorial writer says: "The reason for relaxing the rule in such cases is that it is more than the master can do to keep a changing working place safe from transient, shifting hazards which spring up only as the work advances."

III. We need not explore the entire field of res ipsa loquitur in order to determine its lack of applicability here. The

standard definition is found in 65 C. J. S., Negligence, section 220(2). It embodies two conditions which do not appear in this record: 1. The thing which caused the injury must have been under the management or control of defendant. 2. The accident must be such as in the ordinary course of things does not happen if those in charge use proper care.

The first condition has been held to mean the management must be so much under the *exclusive* control of defendant as to charge him with superior knowledge or means of information as to the cause of the accident. 65 C. J. S., Negligence, section 220(5); Savery v. Kist, 234 Iowa 98, 103, 11 N.W.2d 23. "Our decisions involving the res ipsa rule have uniformly stressed the necessity of defendant's complete and exclusive control of the instrumentalities that cause the injury." Eaves v. City of Ottumwa, 240 Iowa 956, 970, 38 N.W.2d 761, 769, 11 A. L. R.2d 1164, citing Pierce v. Gruben, 237 Iowa 329, 347, 21 N.W.2d 881, 889, 19 N. C. C. A., N. S., 73; Whetstine v. Moravec, 228 Iowa 352, 368, 291 N.W. 425.

Clearly defendant here had no such exclusive control as to clothe him with any more knowledge or greater means of knowledge than was possessed by his employees. That the southeast corner of the building was being temporarily held up by the jack alone, pending arrival of more blocking, was open and unconcealed and must have been known and the potential danger understood by all.

Nor can it be said the accident was such as would not ordinarily happen in the absence of negligence. Of course this part of the definition in effect begs the whole question when applied to the facts of this record. It is of course reasonably possible or even probable that the southeast corner of this building would not have gone down had it been braced or blocked against the happening of such an event. But that does not establish that due care required temporary bracing or blocking. We cannot say here the accident would not have happened in the ordinary course of things if due care had been exercised. The question is rather, what did due care require? Due care did not require absolute safety from the possibility that what happened would happen. That was a possibility inherent in the operation.

It was doubtless defendant's duty to use reasonable precautions against the inherent danger of the operation but we cannot hold the happening of this accident "speaks for itself"—speaks that defendant was negligent in not installing temporary blocking or braces while awaiting the arrival of more ties for completion of the job. Defendant had a right to rely on the efficacy of the jack under the temporary circumstances shown. There were no circumstances sufficient to raise a presumption of negligence. Barton v. Armstrong, 237 Iowa 734, 737, 23 N.W.2d 912.

IV. The parties argue the sufficiency of the record to establish decedent's age as a basis for the use of mortality tables in fixing damages. Our decision on other grounds makes consideration of this proposition unnecessary.

We think the decision of the trial court must be affirmed and it is so ordered.—Affirmed.

MULRONEY, C. J., and WENNERSTRUM, MANTZ, HAYS, and THOMPSON, JJ., concur.

OLIVER, J., dissents.

GARFIELD, J., takes no part.