EUGENE J. FUNK v. THE LEONARD CONSTRUCTION CO., Appellant.

**Master and servant:** VICE-PRINCIPAL: NEGLIGENCE. The question of 1 whether an employee is acting in the capacity of a vice-principal is to be determined from the character of the service performed

by him rather than from his title or rank. A general superintendent in charge of work, directing what should be done, the time and manner of performing the service, and with authority to employ and discharge workmen, was a vice-principal, and his act in furnishing a servant an unsuitable appliance was negligence for which the master was liable.

**Same:** NEGLIGENCE: SAFE APPLIANCES: EVIDENCE. An employer is required to exercise reasonable care in furnishing a servant with appliances which, if handled with ordinary prudence, can be safely used in the performance of the work; and he is responsible therefor whether this duty is performed directly by himself or through another. Evidence held to require submission of the question of whether defendant exercised reasonable care in furnishing plaintiff with a rope suitable for hoisting iron pipes.

**Same:** INSTRUCTIONS. An employer is only bound to use ordinary care in selecting and furnishing suitable appliances with which his servants are to work: So that an instruction in an action for injury caused by the breaking of a rope used in hoisting heavy pipes, that if the rope broke because it was not strong enough and reasonably sufficient to stand the strain the defendant would be liable for negligence was erroneous, and the error was emphasized rather than cured by another instruction correctly stating the law.

**Same:** INSTRUCTIONS: REFUSAL OF REQUESTS. Where the evidence was conflicting as to whether plaintiff's injury was caused by the use of an insufficient rope or because a knot was improperly tied in the rope, an instruction that if the evidence was just as consistent with one theory as the other plaintiff could not recover was properly refused; as the court in other instructions told the jury that plaintiff could only recover if the rope broke because insufficient, and could not recover if it broke because improperly tied.

*Appeal from Linn District Court.*—HON. F. O. ELLISON, Judge.

THURSDAY, APRIL 10, 1913.

ACTION for damages resulted in a judgment against defendant, from which it appeals.—*Reversed.*

*Dawley & Wheeler,* for appellant.

*Jamison, Smyth & Hann,* for appellee.

LADD, J.—The defendant, an Illinois corporation, was engaged in the construction of two large buildings in Cedar Rapids and had in its employment many workmen. At the time in question, only the foundations of these buildings had been constructed. These were about eighty feet apart and between them stood a small wooden structure with gable roof fifteen or twenty feet high at the eaves and thirty-eight feet at the comb. On one side of this building, and near its end, a temporary tower had been erected, ninety or one hundred feet high, for the purpose of elevating the concrete after being mixed below, and distributing it to different parts of the buildings through a pipe which extended from a hopper near the top of this tower to a lower tower, and then to the buildings below. The pipe, after running to the building north of the tower, had been taken down and on June 3, 1910, was lying on the floor of the south building and across the wooden structure preparatory to raising it by means of pulleys to its proper position for distributing concrete to the south building. These pulleys were attached to hooks at the end of an inch shank and were hooked over a steel cable extending from near the top of the tower and with the other end attached to some object beyond the lower tower, and were kept from sliding down the cable by one-half inch manila rope, called the "spreader rope," which was tied to the tower immediately underneath the steel cable with a three-fourths inch rope six to eight feet long doubled, so that it could be shortened by twisting, and to each of the pulleys, being tied with a knot to the shank of each pulley. Wires were fastened from this shank to the point of the hook so that it would not slip off the cable. This left the spreader rope close to or against the cable and the pulleys five or six feet apart. The pipe was eight inches in diameter and in sections twelve feet long. These were fastened together and laid in a wooden trough. Long half-inch ropes, called "lift ropes," were tied around the pipe and trough, and the other end run through

the pulleys and down for the men to take hold of and pull in raising the pipe to position for use.

To the end of the steel cable at the top of the tower was attached a strong wire which extended to an iron windlass on the ground one hundred and eighty-three feet distant, and, by means of this windlass, the cable was let down near the floor or ground and hauled back in place. It had been unwound so as to allow the cable to sag until it nearly reached the floor where the pipe and troughs and ropes were lying. Before raising the pipe to position, several of the sections were fastened together and laid in the wooden trough. The ends of lift ropes having been tied about this as far apart as the pulleys, the other ends run through the pulleys and are taken hold of by the men. The cable was straightened up by means of the windlass and the pipe and troughs raised by the men pulling the long ropes through the pulleys from the floor. After the north end of the spout got above the "eaves" of the wooden building, it swung lengthwise toward the tower so that part of it was above the roof of the small building and a part above the floor of that being constructed. Then the cable was again lowered, some sections of pipe added, the pulleys slipped further up on the cable toward the tower and cable partly straightened again, and the pipe again raised by means of the lifting ropes which were so arranged as to again swing the pipe lengthwise toward the tower. This was continued until about one hundred and ten feet of pipe and trough had been coupled together, and in the same manner an effort was made to lift the pipe to the place where this north end could be attached to the hopper at the east side near the top of the tower. When all the pipe had been coupled together and the hooks adjusted on the steel cable for the final lifting of the pipe to its proper position, the general superintendent in charge of the work constructing the buildings, Byron, ordered the plaintiff to go from the floor of the building being constructed where he was then engaged to the roof of the wooden building

and assist in pulling on the lifting ropes which came down from the pulleys above. Upon reaching the roof, one of the four men already there handed plaintiff a rope which came down on the west side of the pipe and trough, the others coming down on the east side; and, as plaintiff could not pull where they were standing without doing so against the pipe, he went westward along the comb of the roof until about eight feet west of the pipe, and there pulled on the lifting rope, about forty others doing the same, and, when the pipe had reached to a position about twenty feet above the comb of the roof where plaintiff stood, the spreader rope broke between the first and second pulleys from the tower, and, as the men let go the lift ropes, the pipe and troughs fell, the latter striking plaintiff and rendering him senseless so that he rolled off the roof to the ground below and was seriously injured.

The only question of negligence submitted to the jury was whether defendant failed to exercise ordinary care in furnishing a rope which was strong enough and reasonably suitable and sufficient to bear the strain and sustain the weight of the metal spout and trough which were used in carrying the concrete.

I. The first contention is that Byron, in using the one-half inch rope instead of one three-fourths of an inch in

1. MASTER AND SERVANT: vice-principal: negligence, diameter as a spreader rope was a fellow servant of plaintiff for that this concerned merely a detail of the work, and for this reason the defendant is not liable. This is on the theory that, safe tools and appliances having been furnished by the master, he is not responsible for the choice by the servant of those which are unsafe, even though this may have been done at the suggestion of the foreman. *McQueeny v. Railway,* 120 Iowa, 522; *Benn v. Null,* 65 Iowa, 407; *Ashcraft v. Davenport Locomotive Works,* 148 Iowa, 420; 1 Bailey, Personal Injuries, section 196; *Maher v. Thropp,* 59 N. J. Law, 186, (35 Atl. 1057); *Brown v. People's Gas Light Co.,* 81 Vt. 477, (71 Atl. 204, 22 L. R. A. [N. S.] 738); *Alaska Treadwell Gold*

*Mining Co. v. Whelan,* 168 U. S. 86, (18 Sup. Ct. 40, 42
L. Ed. 390) ; *Ross v. Walker,* 139 Pa. 42, (21 Atl. 157, 159, 23
Am. St. Rep. 160) ; *Prescott v. Ball Engine Co.,* 176 Pa. 459,
(35 Atl. 224, 53 Am. St. Rep. 683). The last two cases lay
stress on the fact that the foremen, whose acts were treated
as those of fellow servants, were not those of vice principals.

In *Vogel v. American Bridge Co.,* 180 N. Y. 373, (73
N. E. 1, 70 L. R. A. 725), the defendant "had contracted to
erect an iron or steel frame for a roof upon a factory build-
ing, and the plaintiff was one of a gang of men employed by
the defendant upon the contract work. The foreman, or 'boss
of the job,' as he is called, was one McMahon, a competent
man, and the workmen were under his direction. His author-
ity comprehended the management of the work and the em-
ployment or discharge of the workmen on the job. At the
time the accident occurred, the men were engaged in raising
one of the trusses to an upright position in order thereafter
to raise it into its place in the roof. This was effected by
a rope attached to the peak of the truss, which ran to the
block and tackle of a pole or derrick. A rope which lay upon
the ground, being examined by some of the men, was rejected
by them as not being strong enough. They proceeded to the
toolhouse to get another rope, and, having been asked by the
foreman their purpose, were told by him to go back and
use the one they had, saying, 'It is strong enough.' They
did so, and made the rope fast. Before the truss was raised
into position, the rope broke, and the truss fell upon the
plaintiff and broke his leg." The court was divided as to
whether the defendant was liable. Gray J., with whom three
of the judges concurred, saying:

The doctrine of the responsibility of the master for the
neglect or default of one who, in the eye of the law, is his
alter ego applies to the obligation to furnish to his employés
a reasonably safe place to work in and safe appliances to
work with. When the master is represented by one who
may be regarded as his alter ego or a vice principal in the

work, if the specific act which is the subject of a complaint is one which can be properly regarded as within the personal duty of the master, and not as some act in the line of a mere servant's duty, then the master is justly chargeable with the results, whether it be an act of negligent performance or one of omission. . . . In all cases where the question of the master's liability in this form has arisen, it is made to depend upon whether the act omitted or neglectfully performed by the alter ego was one which might be regarded as within the personal duty of the master, or whether it was some act in the line of a mere servant's duty. If, in the exercise of judgment by the master's representative, he omits to do something which has been foreseen and provided against by the master, the latter should not be regarded as chargeable with a responsibility for the result. . . . The contract of the master does not extend further in the direction of indemnifying his servant against injury from negligent acts than that the negligence must be his own, or such as is legally to be charged to him. If the master does or must employ some one to represent him in managing the performance of the work, and he neglects no precaution in the selection of a competent foreman and in making all reasonable provision for a safe and proper execution of the work, he has discharged his duty. As to the details in the execution of the work, the foreman and workmen are fellow servants.

The defendant was held not to be liable. On the other hand, Cullen, C. J., with whom two judges concurred, declared that:

McMahon was not a mere fellow servant of plaintiff but the alter ego of the defendant, and that for his negligence the defendant was liable. The furnishing of suitable rope and other appliances for the prosecution of the work was the master's duty. If the alter ego of the master refused to give the workmen a proper rope, I cannot see that the case differs in principle from one where the master failed to provide rope at all. . . . The vital distinction between this case and those cited by my Brother Gray is that in those cases the negligence which was the foundation of the plaintiff's claim was that of a mere foreman. Here it was the negligence of one who for all purposes was the repre-

sentative and vice principal of the defendant. When the master furnishes sufficient appliances, and an unsuitable one is used, owing solely to the act of a mere foreman or other employé, then such selection is a detail of the work for which the master is not responsible. But when the use of the improper appliance is due to the refusal of the master or his alter ego to allow the workmen to take a proper appliance, though he may have such appliances on hand, the situation is exactly the same as if he had failed altogether to furnish proper appliances.

The real difficulty lies in the determination of whether what was done was within the scope of the employment of the vice principal or of that of a fellow servant. In this state, the test in determining whether the relation to the master is that of vice principal is not so much the title or rank of the employee as the character of the service performed. *McQueeny v. Railway,* 120 Iowa, 522; *Collingwood v. Railway,* 125 Iowa, 537; *Beresford v. American Coal Co.,* 124 Iowa, 34.

Regardless of whether the majority or minority of the judges in the *Vogel* case were right, it is very clear that, in the case at bar, the superintendent, in what he did, was acting as vice principal. Byron was the general superintendent in actual charge of the construction of the buildings, with several foremen under him, and directed what should be done, how, and when, and employed and discharged the workmen. Another Hadsell appears to have been in general control of the defendant's affairs in constructing these and several buildings in other cities. He visited Cedar Rapids a few hours about once a week and looked over the work being done and was Byron's superior in authority. Byron testified that "we" bought the ropes of a hardware company in Cedar Rapids; that "the ropes were attached to the hooks and pulleys by means of a knot and some by a half hitch"; that "Frank Ware and Jesse Eaton and others attached the ropes"; that this was done before the pipe was raised for the north building; that, in choosing the half-inch

rope, he considered it sufficient; that he and Hadsell thought it strong enough; that "the greatest strain or weight of the spout fell on the steel cable; that there was very little strain on the small rope;" that "we had three-fourths inch rope"; that he never discussed the question of whether to use the three-fourths inch rope with any one except Hadsell; that he was not familiar with the strength of ropes, save from long experience, and that, in using a half-inch rope, he relied on the judgment of Hadsell.

This spreader rope was not used by the workmen, save in connection with and as a part of the apparatus as an entirety for raising the pipes and troughs of which it was as essential an element as the cable or the hooks. The lifting ropes were used by the workmen, and, had the defect been in these, there would be some ground for saying they were responsible for mistakes in selection; but they had nothing to do with the use of the spreader rope, save as this was a part of the apparatus or rigging furnished for the purpose of lifting the pipes in place. They were no more concerned in the selection of one part thereof than the other. As an entirety, it was furnished by the defendant or by Byron and Hadsell, acting for it; and, as furnishing the necessary appliance with which to do the work is a masterial duty therein, they were vice principals. *Cal. Hirsch & Sons Iron & Rail Co. v. Coleman,* 227 Ill. 149 (81 N. E. 21).

It is elementary that the employer is required to exercise reasonable care in furnishing appliances which, if handled with ordinary prudence, can be safely used by the employee in the performance of the task assigned him, and he is responsible therefor whether this duty is performed by himself or through another. In other words, such duty is nondeligable. *Fink v. Des Moines,* 84 Iowa, 321; *Wilder v. Great Western Cereal Co.,* 134 Iowa, 451; *Anderson v. Railway,* 109 Iowa, 524.

2. Same: negligence: safe appliances: evidence.

There was evidence tending to prove the negligence alleged. Whether the spreader rope had broken in raising

the pipe for the north building was in dispute. Haller testified that, about the time he and Funk were ordered to go on the wooden building, he brought a three-fourths inch rope to Byron, having been ordered by some one to get it, and asked him if he was going to use it, and that Byron said "No"; that Haller then asked what he was going to do with it, and Byron said, "Throw it down some place there and go on the roof." Gardner testified that, when preparing to raise the pipe, some one asserted that he did not think the spreader rope was strong enough, and suggested a heavier rope, but that Byron replied, "We haven't time to bother with that, and we will put it up that way." Byron denied that the three-fourths inch rope was brought by Haller or that anything was said to him about using a stronger rope. As the rope was a part of the appliance, Byron's refusal to change it was merely an insistence on the use of the appliances as furnished. The evidence was enough to carry the issue of whether defendant had exercised reasonable care in furnishing an apparatus for lifting the pipes and troughs with rope of sufficient strength; and the contention of defendant that what Byron did in the matter was merely the act of a fellow servant is without foundation.

II.   The thirteenth paragraph of the charge is criticized. Therein the court instructed that:

If you find that the rope broke because it was not strong enough and reasonably sufficient to stand the strain and support the spout which it was used in raising, then the defendant would be guilty of negligence, even though you may also find that other causes contributed to the breaking of the rope. If you find from the evidence that the rope was strong enough and reasonably sufficient to stand the strain and support the spout, and that it broke because of the knots being improperly tied in such a way as to weaken the rope, and not because of its insufficiency or want of strength, independent of the knots or the way they were tied, then the defendant would not be liable. But if you find from the evidence that defendant was guilty of negligence in failing

to furnish a sufficiently strong rope, as charged, and that by reason thereof plaintiff was injured while in the exercise of ordinary care and caution on his part, the defendant would be liable, although you may further believe from the evidence that the negligence of a fellow servant contributed to the injury.

This instruction was erroneous for two reasons: (1) It is not a correct statement of the law; and (2) it is in conflict with the ninth instruction, which laid down the law correctly by saying that, ''if the defendant exercised ordinary care, caution, and judgment in selecting and furnishing rope for it that was strong and reasonably sufficient and suitable for the purpose of elevating said metal spout when properly used, and did not know, or in the exercise of ordinary care and caution could not have known, that the rope so furnished was not strong enough to bear the strain of weight which was to be put upon it in raising said spout to its position, then the defendant would not be guilty of negligence.''

3. SAME: instructions.

The seventh instruction was of import like the ninth, and the same thought was expressed in others, and in the fourth the jury was told that the mere breaking of the rope raised no presumption of negligence on the part of the defendant. That the law is as stated in the ninth instruction is not open to dispute. All required of defendant was that it exercise ordinary care in furnishing suitable appliances with which to perform the work; in this case the apparatus for raising the pipes with spreader rope strong enough and reasonably sufficient to stand the strain. But the jury was told in instruction 13 that, if it was not in fact strong enough and sufficient to stand the strain, the defendant was negligent. As it was not, this, in effect, told the jury to find against it on this issue. The difference between furnishing a reasonably safe appliance and exercising ordinary care in so doing may be and often is, in view of the facts disclosed, merely a matter of technical accuracy and error in defining the

duty to furnish a safe appliance instead of exercising ordinary care in doing so may sometimes prove to be without prejudice. *Brusseau v. Brick Co.,* 133 Iowa, 245. But here the essence of defendant's duty was that of selecting a suitable spreader rope for the apparatus employed.

It was not necessarily bound to furnish one strong enough, as the jury was told, but to exercise ordinary care and skill in selecting one of sufficient strength to carry the load and resist the strain to which put in the use made of it. Considering the instructions as a whole does not obviate the error in the first sentence, for it is emphasized rather than explained by what follows. The fact that the law was laid down correctly elsewhere did not obviate the error, for the jury would not know which rule to follow. A like error was adjudged reversible in *Armour & Co. v. Russell,* 144 Fed. 614 (75 C. C. A. 416, 6 L. R. A. [N. S.] 602). There is no escape from the conclusion that there was error in the instruction and that the same was prejudicial.

III. The sixteenth instruction was rightly refused because the evidence was in conflict as to whether the rope broke because of the knot at the shank of the pulleys being improperly tied or the rope not being of sufficient strength. The second instruction refused was to the effect that, if the evidence was just as consistent with the theory that the rope broke because it was improperly tied as that this happened for that it was too small, the plaintiff had failed to make out a case. There was no error in refusing thus to emphasize the balancing of probabilities in view of the fact that, in the ninth instruction given, the jury was told that only in event of the rope not being strong enough could plaintiff recover; and in the thirteenth instruction that, if the rope broke because of the knots being improperly tied, the same result must follow. This put the issue clearly before the jury. The fifteenth instruction requested was included in those given. It will be necessary to modify the twelfth instruction on

4. SAME: instructions: refusal of requests.

another trial. The issue of contributory negligence was for the jury, and so clearly does this appear that a review of the evidence seems unnecessary.

Because of the error pointed out, the judgment is *Reversed*.