WALTER O'REAGAN, appellant, v. E. M. DANIELS, appellee.

No. 47668.

(Reported in 44 N.W.2d 666)

NOVEMBER 14, 1950.

H. J. Williamson, of Manchester, and Elliott, Shuttleworth & Ingersoll, of Cedar Rapids, for appellant.

Thomas H. Tracey, William W. Gilkey and Yoran & Yoran, all of Manchester, for appellee.

BLISS, J.—The facts in this case are not in dispute in any material matter.

Plaintiff, fifty-four, had worked for defendant in his lumberyard and on his farm for about six years. In May 1946, defendant directed the plaintiff to help defendant's daughter, Gwen Daniels, and Joe Penado, another employee of defendant, to haul baled hay to the barn on defendant's farm, and to hoist and store

it in the haymow of the barn. The barn had gable ends. In the east end of the barn a large door opened into the haymow. This door was six feet wide and extended to the upper angle of the gable. The sill at the bottom of the door opening was eighteen feet above the floor of the haymow. At that end of the mow the floor was bare and free of hay. Attached to the doorsill on the inside was a narrow platform, the width of the door—a sort of catwalk. It was about eighteen inches wide in the middle and tapered to a width of six or eight inches at each end. To reach the doorsill from the mow floor there was a ladder made by nailing crosspieces between and to two studs. The equipment for hoisting the hay was similar to that commonly used in farm barns for that purpose. The hayfork was attached to the lower end of a rope which extended upward to, and over, a stationary pulley in the upper angle of the gable just above a trip at the east end of a track which extended horizontally just under the ridge of the roof to the other end of the haymow.

The hay was hauled in a flat open truck to beneath the haymow door. Plaintiff's normal work was on the floor of the mow, and, when the equipment was working properly, his duties consisted in seeing that the hoisted bales were properly piled in the haymow. Penado would stick the prongs of the fork into the bales of hay and then signal Gwen Daniels, who was operating another truck with the other end of the rope attached to its rear end and running through other pulleys to drive forward and hoist the loaded fork to the haymow door, where it would enter the trip and the track and be drawn back into the haymow.

The difficulty with the process was that when the fork began to rise the rope between the fork and the pulley above would often twist and kink and would not pass through the pulley. When this would happen "the girl had to stop or else the rope would break or a pulley would tear loose." When the rope became tight and taut behind the truck she would know the rope was jammed. Sometimes she would continue forward and the rope would untwist and go through the pulley, but sometimes it would not. She would then back the truck and lower the loaded fork and in whirling as it descended the rope would untwist, and then by going forward the rope would sometimes pass

through the pulley, but more often the rope would again twist and kink. It was then the plaintiff's duty to climb to the cat-walk and whirl the loaded fork until the rope would untwist and unkink and go through the pulley. For these occurrences when the rope would jam, a four-foot stick was kept near by to aid in twirling or whirling the loaded fork, but if the load was stalled high near the pulley the stick was of little help and it was necessary for plaintiff to stand on the catwalk and untwist the rope by whirling the fork load with his hands. When the rope unkinked the tension of the taut rope itself would sometimes pull the fork into the trip and the load would suddenly swing through the door, and unless the plaintiff was watchful and active he was in danger of being struck. The stick was not about on the day of plaintiff's injury.

There is no controversy over the facts stated above or those which we now state. The jury could have found, and there was no evidence to the contrary, that this rope was defective with respect to twisting and kinking from the time it was purchased in July 1945. They had trouble because of its twisting during the hay season that year. Plaintiff testified:

"Ed [Mr. Daniels] went down and bought the rope * * * and put it in the barn. It kept twisting and Ed took it out, and we pulled it around the field behind the car—tied the rope behind his automobile. I rode along with him. He was driving. He did it to keep it from twisting and to take the kinks out of it. He [defendant] was there when the rope twisted that year. After he had dragged the rope around we put it back in the barn. Q. Was it all right then? A. Mr. Daniels told me to take it out and turn it end to end but it didn't make any difference. Q. It still wasn't any good? A. No. Q. What was wrong with it? A. Twisted just the same. Q. Did you continue to use it? A. Yes, we kept on using it. Q. It did jam on occasion? A. Yes."

Speaking of the day of his injury in the latter part of May 1946, plaintiff testified:

"This was the first day we used the hay rope this year and the rope was the same rope and in the same condition as it had been the year before. * * * On the first truckload—about sixty

bales—which we put in, the rope twisted twice and the rest of the time on the first truckload the rope didn't twist so I had to go up and untwist it. * * * Each fork full carried four bales. When the rope would twist and jam so that it would not go through the pulley I went up and untwisted it. The rope would have a tendency to twist every time but sometimes it would untwist itself. When the rope jammed I went up and untwisted it by reaching for a bale and twisting it around with my hand or a stick. It was only necessary for me to climb to the platform twice on the first truckload of bales. We got another truckload of bales. * * * On the first fork full of this second truckload of bales the rope twisted and jammed in the pulley and I climbed to the platform and untwisted the rope. When I untwisted the rope the fork and the bales pulled up to the carrier track and into the barn and hit me and knocked me off. Before I got away it was pulled in and caught me on the platform."

On cross-examination, plaintiff testified:

"At the time of the accident I had been sent up there to work by Ed Daniels. He said to go and put the hay away, back in the west end of the barn like I always did. * * * Mr. Daniels got the new hay rope in July before the accident. * * * We had trouble with the fork at that time. Just how many fork fulls twisted in July I wouldn't say, but pretty bad. One night putting up hay pretty near every one of them twisted. * * * Q. Well, was that the only way that had been used to get the bales in when the fork twisted? A. That's right. Q. That was the only way it could be done was to go up and stand in the middle of the doorway? A. That's right."

Plaintiff testified that he had a stick sometimes and sometimes used his hands, and that it was not possible to straighten out the fork full in any other way; that he had got up on the middle of the platform fifty times or more to untwist the rope.

"Q. And you were right in the middle of the platform? How did you get out of the way? A. Walk out if I had a chance. Q. Every other time you got out of the way? A. Yes. Q. A fast or slow walk? A. Sometimes you would have to move, and sometimes you would have lots of time. Q. Going up there and standing that way, facing a fork load of bales and knowing that

as soon as the twist got out of the rope the carrier would trip, didn't you feel that there was some danger there? A. As soon as it tripped it was right in. Q. Didn't you feel there was danger there? A. Sure there was danger there. Q. Didn't you feel the fork might hit you and knock you off the platform? A. Sure I knew it would. * * * Q. You did not object to doing it? A. No, but I told them it was dangerous having that rope running that way. Q. And at the time of the accident you scrambled up and got in the middle of the platform again? A. Sure, to get the twist out of the rope. Q. You knew if they would just hold up and let the fork down the thing would untwist itself? A. Yes, but when it would come up it would twist again. Q. You knew it wasn't necessary to get up there to untwist it? A. You had to get up there. Q. State whether the proper way was to let the fork down and let it untwist itself? A. Yes, yes. But when it come up it would twist again. Q. Would it always twist? A. I said yes. Q. Did you try that? A. Yes. Q. And it always twisted when it came up again? A. Yes. Q. Sometimes a load would come up without twisting? A. Yes. Q. But when it once twisted and was let down and hauled up again it always twisted again? A. Yes."

Joe Penado testified that when he and the plaintiff were leaving in the truck on the day of the injury the defendant said to him: "Come up and help him put that baled hay in the barn. He might have trouble with that rope. We had trouble the year before. Q. He warned you before you went out? A. Yes. He said they had trouble the year before. I wasn't here the year before."

Speaking of what took place during the morning of plaintiff's injury, Penado testified:

"The rope twisted twice on the first truckload. Sometimes the rope would twist and not jam and sometimes it would not always come back. It would sometimes jam in the pulley and wouldn't go up or down and we would have to untwist it. If you couldn't reach it with a stick, you had to touch it with your hands and you couldn't do a very good job of untwisting from the side. You had to stand in the middle and run. The girl driving the truck was forced to stop when the rope twisted or

jammed. She could see the rope, and the wheels would stop and kill the motor if the rope jammed. After the tight rope untwisted, it would go right into the barn. When it untwisted, the tautness in the rope pulled the load up and into the barn. If it was down a foot, you had more time, but if it was up six inches, it came in much quicker and the bales would be forced in because of the tension of the hay rope. After the accident happened on the morning of the injury, Mr. Daniels' boy brought a new hay rope out to the farm."

On cross-examination, Mr. Penado testified:

"I saw O'Reagan knocked off the ledge. The truck had not started. It was merely the pull of the tension of the rope that pulled the fork through the door. Any hay rope will twist at times. Some twist worse than others. If you turn it end for end some will straighten out. Q. From your experience, isn't it true that any hay rope will twist at times? A. Twist, but I never saw one like that one though."

The first error assigned by plaintiff is that the court erred in directing a verdict for defendant upon the ground that the evidence of plaintiff was insufficient to establish any negligence on the part of defendant. The principles of law involved in this assigned error are so well-recognized and so long settled that little discussion or citation of authority is necessary.

I. Was the issue of defendant's negligence for the jury to decide? If reasonable minds might reach different conclusions on this issue it should have been submitted to the jury. Short v. Powell, 228 Iowa 333, 335, 291 N.W. 406; Wood v. Tri-States Theater Corp., 237 Iowa 799, 800, 23 N.W.2d 843; Lawson v. Fordyce, 234 Iowa 632, 636, 12 N.W.2d 301; Hebert v. Allen, 241 Iowa 684, 687, 41 N.W.2d 240, 242.

II. The evidence must be considered in the aspect most favorable to the plaintiff and we must accord to him the benefit of all proper inferences. Odegard v. Gregerson, 234 Iowa 325, 329, 12 N.W.2d 559; Lathrop v. Knight, 230 Iowa 272, 275, 297 N.W. 291; Lorimer v. Hutchinson Ice Cream Co., 216 Iowa 384, 390, 249 N.W. 220.

III. It is a rule of common law and has been the settled rule of this court that the master or employer must use reason-

1206

able care and diligence to provide and maintain a reasonably safe place for his employees to work. Foley v. Cudahy Packing Co., 119 Iowa 246, 255, 93 N.W. 284; Martin v. Des Moines Edison Light Co., 131 Iowa 724, 729–731, 106 N.W. 359. And the same care and diligence is required of the employer to provide and maintain reasonably safe appliances, machinery and tools with which to do the work. Peterson v. McCarthy Improvement Co., 175 Iowa 85, 87, 88, 156 N.W. 801, and cases cited; Oestereich v. Leslie, 212 Iowa 105, 112, 234 N.W. 229; Murray v. Swanwood Coal Co., 159 Iowa 1, 4–6, 138 N.W. 887; Funk v. Leonard Constr. Co., 159 Iowa 320, 328, 140 N.W. 816; Swaim v. Chicago, R. I. & P. R. Co., 187 Iowa 466, 474–483, 174 N.W. 384; Bell v. Brown, 214 Iowa 370, 375, 377, 239 N.W. 785; Correll v. Williams & Hunting Co., 173 Iowa 571, 577, 578, 155 N.W. 982, Ann. Cas. 1918A 117; Lang v. Hedrick, 229 Iowa 766, 775, 295 N.W. 107.

The evidence shows without contradiction that defendant knew during the haying season of 1945 that there were defects in the hoisting rope. He knew this because he was present while hay was being hoisted and observed how the rope twisted, kinked and jammed and failed to pass over the pulley wheel until someone got up on the narrow platform and relieved the jammed rope. He personally tried to remedy the condition by dragging the rope behind his automobile, and then replacing it, and reversing the rope through the pulleys. None of these remedies was successful, but he continued to use the rope through the 1945 haying season. In May 1946, when he directed Penado and plaintiff to fill the mow, he spoke of the trouble the rope made for them the preceding year and warned them to be on their guard. After plaintiff was injured, defendant on the same day replaced the rope with a new one. In hoisting sixteen full forks of baled hay in the forenoon of May 27, 1946, three of them jammed so that it was necessary that plaintiff climb to the narrow platform and relieve the difficulty. Thus in approximately twenty per cent of the hoisting the appliance did not operate properly. At times before plaintiff had to mount the platform and disengage the jam, and many times the rope would twist and jam on other occasions when the trouble was remedied by efforts other than mounting the platform. Under the record the jury could have

fairly reached the above-stated conclusions. It could have found that defendant failed to use reasonable care to furnish a reasonably safe place for plaintiff's work and reasonably safe appliances to work with.

It is our conclusion that the issue of defendant's negligence in these matters was for the determination of the jury, and the court erred in taking the issue from the jury.

The second error assigned by plaintiff is that the court erred in sustaining defendant's motion to direct a verdict for defendant upon the ground that plaintiff had voluntarily assumed the risk attendant upon working at the place and using the appliances furnished by defendant.

IV. It is our conclusion that under the evidence that issue should also have been submitted to the jury and that the court erred in failing to do so. In support of this conclusion we set out section 88.14, I. C. A., Code of 1946, to wit:

"88.14 Assumption of risks. In all cases where the property, works, machinery, or appliances of an employer are defective or out of repair, and where it is the duty of the employer from the character of the place, work, machinery, or appliances to furnish reasonably safe machinery, appliances, or place to work, the employee shall not be deemed to have assumed the risk, by continuing in the prosecution of the work, growing out of any defect as aforesaid, of which the employee may have had knowledge when the employer had knowledge of such defect, except when in the usual and ordinary course of his employment it is the duty of such employee to make the repairs, or remedy the defects. Nor shall the employee under such conditions be deemed to have waived the negligence, if any, unless the danger be imminent and to such extent that a reasonably prudent person would not have continued in the prosecution of the work; but this statute shall not be construed so as to include such risks as are incident to the employment; and no contract which restricts liability hereunder shall be legal or binding."

See also the following cases cited in Division III hereof: Peterson v. McCarthy Improvement Co., 175 Iowa 85, 90; Oestereich v. Leslie, 212 Iowa 105, 112; Bell v. Brown, 214 Iowa 370, 377-379; Correll v. Williams & Hunting Co., 173 Iowa 571,

576–579, 585, 586; Lang v. Hedrick, 229 Iowa 766, 773–775. Other cases are Johnson v. Kinney, 232 Iowa 1016, 1019, 1020, 7 N.W.2d 188, 144 A. L. R. 997; Murray v. Swanwood Coal Co., 159 Iowa 1, 8–12, 138 N.W. 887.

Considering that plaintiff had no duty to repair any of the appliances or fixtures and that he had escaped injury in the past in disengaging the jammed rope by the same method which he used when he was injured, it is our conclusion that it was for the jury to say whether the danger was so imminent that a reasonably prudent person would not have continued in the work.

The judgment is—Reversed.

GARFIELD, C.J., and OLIVER, WENNERSTRUM, MULRONEY, MANTZ, and HAYS, JJ., concur.

HALE, J., not sitting.