DONALD NIKOLAS, appellant, v. JOE KIRNER, appellee.

No. 48810.

(Reported in 73 N.W.2d 7)

November 15, 1955.

B. C. Sullivan, of Rockford, and Zastrow, Noah & Smith, of Charles City, for appellant.

Donohue & Wilkins, of New Hampton, for appellee.

LARSON, J.—This action at law was commenced by plaintiff, an experienced jockey or horseman, against the defendant-owner of a race horse named Danny Meade, for injuries the plaintiff received while exercising the horse. The trial court directed a verdict for defendant at the conclusion of plaintiff's evidence, and plaintiff appeals. The motion to direct was sustained generally as to all grounds, but the complaint made to us is that the court erred in holding (1) as a matter of law that plaintiff was not an employee of defendant at the time of the accident, (2) that the question of defendant's negligence was not a question for the jury, and (3) under the circumstances that plaintiff assumed all the risks, hazards and dangers at that particular time. Plaintiff had alleged that he was an employee of the defendant, that the horse he was asked to exercise was a dangerous animal, that the defendant had knowledge of that fact but did not warn plaintiff of it, and that at the time in question the defendant was negligent in jerking a rope, attached to the horse's neck, in such a manner as to excite the animal and cause it to rear backwards and fall upon him.

The plaintiff, Donald Nikolas, age 22, had ridden Danny Meade in several races two or three years before, but had not mounted it since that time. From his past experience he believed the animal gentle and quiet, as race horses go, and agreed to ride the horse in a race at Mason City the following week. As the horse had been on pasture, it was suggested by defendant that plaintiff come over to exercise it prior to the race. On the evening of August 13, 1952, plaintiff came unannounced to defendant's home in Chickasaw County for that purpose. He brought his own saddle. Upon his arrival he found defendant already exercising the riderless horse at the end of a long rope. Danny Meade was brought into the barn, saddled, and again taken to the exercise lot. At that time plaintiff testified he said "Remember, Joe, I got to get paid for this" and Joe said "All right." There was also a previous conversation as to the manner of payment, which will be referred to later. When plaintiff, defendant and the horse reached the exercise lot, plaintiff asked about the strange hitch

which he said defendant placed upon the animal. There was a short rope or strap from the bridle or bit ends to the saddle, and another long one connected through the halter ring and around the horse's neck. Plaintiff testified his suspicions were aroused by this hitch and he asked defendant three times if the horse was all right and whether or not anything had happened to it since plaintiff had last ridden it. Defendant had answered assuring him the horse was "all right" and thereupon plaintiff mounted the animal. It stood quietly. Then defendant started out ahead of the horse with the long lead strap. Plaintiff objected and said he twice called to defendant to come back and start out by walking beside the animal while close to its head. However, defendant did not come back but walked on out about 25 feet from the horse and rider, turned around, raised his arms and pulled or jerked upon the lead rope. This brought pressure behind the animal's ears, and the horse, which had been standing quietly, came up on its back legs, lost its balance, and fell upon the plaintiff, injuring him. Plaintiff's father and mother were immediately called to the scene and testified that they asked defendant if he put the boy on a wild and vicious animal, and to the question "Was he wild?" defendant said " 'Yes, but—' ", and to the question "Did you tell Donald about it?" he said " 'No, I didn't.' " There also was testimony as to the injury the plaintiff suffered, which we need not consider at this time except to say the testimony, if believed, indicated it was of a serious and permanent nature.

I. The principal question is, in the light of all the facts and circumstances, was the issue of defendant's negligence for the jury to decide. If reasonable minds might reach different conclusions on the issue, it should have been submitted to the jury. O'Reagan v. Daniels, 241 Iowa 1199, 44 N.W.2d 666, and cases cited therein.

II. In view of the fact the trial court sustained the motion for a directed verdict at the close of plaintiff's testimony, the evidence must be considered in the aspect most favorable to the plaintiff and we must accord to him the benefit of all proper inferences. Cable v. Fullerton Lbr. Co., 242 Iowa 1076,

49 N.W.2d 530; Hahn v. Strubel, 243 Iowa 438, 446, 52 N.W.2d 28, and cases cited therein; O'Reagan v. Daniels, supra.

■ III. While defendant contends he and plaintiff were engaged in a joint purpose, i.e., taking their horses to county fair races, there is evidence tending to substantiate plaintiff's claim that he was specially employed to exercise Danny Meade *before* the Mason City race. Plaintiff testified:

"Joe Kirner asked me if I was going to take my horse to the Mason City fair which was coming up and I told him I was because the horse was running pretty good. * * * Joe said, 'We'll get Danny Meade and we'll have a load and you come down and work him out two or three times before we go.' * * * I told Joe I would have to get paid for it because I couldn't afford to buy gas to drive down if I didn't get paid for it and he said, 'Yes, I expected that.' "

Other conversation was related as to how plaintiff was to be paid, but we think these facts and the fair inferences the jury might draw therefrom were sufficient to permit the jury to decide whether there was such employment here as to burden the defendant with the quite well-settled legal responsibilities of master to servant. At least the relationship shown did obligate defendant to use due care in the protection of plaintiff from any dangers known to defendant, and to do no negligent act himself which would likely cause plaintiff injury or harm.

IV. Plaintiff stoutly contends defendant was negligent (1) in not warning him the horse was wild and dangerous (2) in not walking beside the animal's head for a little distance after plaintiff mounted before going out to the end of the 25-foot lead rope, and (3) in walking out ahead of the animal for some distance, then turning around, raising his arms, and giving the lead rope "a good jerk." These negligent acts, he further alleges, were done despite his objection and warning, and resulted in the horse's rearing up on its hind legs. He contends that because its head was checked down with the short strap, when it reared up it naturally lost its balance and fell backwards, crushing plaintiff under its weight. After plaintiff mounted and defendant started to walk away ahead of the horse, plaintiff testi-

fied he said "Don't, Joe, come on back", but Joe paid no attention to him and went on out to the end of the rope and then jerked on it. He also testified: "* * * when you do something like that and when you get out and jerk, that horse is going to do something, and when he jerked Danny came up. * * * if he would have stayed by that horse, I'll bet you anything that horse would have gone right straight out."

■ It is true the servant assumes the risks that naturally pertain to his work, but he is under no obligation to assume any risks caused by the master's failure of duty. Anderson v. Sheuerman, 232 Iowa 705, 708, 6 N.W.2d 125. Certain risks and dangers naturally inhere in the work plaintiff was doing, as race horses are known to be more or less spirited, but plaintiff must not be held to have also assumed all risks which may result from defendant's negligence or breach of duty. Laws v. Richards, 210 Iowa 608, 611, 231 N.W. 321, and cases cited therein.

■ ■ Was this risk one which was ordinarily and normally incident to that kind of work? We think not. While it does not clearly appear defendant knew the animal was dangerous, three things appear from which a jury might infer he had such knowledge—the hitch which was unusual, at least to plaintiff, and tended to keep the horse's head down; the fact that defendant apparently did not desire to use a short lead rope to start exercising the animal with plaintiff mounted; and defendant's admission to plaintiff's parents that the horse was "wild." We believe these are matters upon which reasonable minds might differ and would thus be for jury determination. Smith v. City of Hamburg, 212 Iowa 1022, 237 N.W. 330; Sergeant v. Challis, 213 Iowa 57, 238 N.W. 442; Bell v. Brown, 214 Iowa 370, 239 N.W. 785. Plaintiff here had a right to assume that defendant-owner who had been handling this horse, with his superior knowledge of the animal and its actions, would not expose plaintiff to unnecessary perils. This would be especially true after an assurance by defendant's statement: "Oh, he's all right; he's okay."

■ It is a rule of common law, and has been the settled rule of this court, that the master or employer must use reasonable care and diligence to provide and maintain a reasonably

safe place for his employee to work, and the same care and diligence is required of the employer to provide and maintain reasonably safe appliances, machinery, instrumentalities and tools with which to work. O'Reagan v. Daniels, supra, and many cases cited therein. It has also been generally agreed that such appliances and instrumentalities include animals that are reasonably safe.

In 35 Am. Jur., Master and Servant, section 196, pages 625 and 626, it is said: "Animals furnished by a master to a servant for the performance of the master's work occupy in law the same status as inanimate tools, instruments, or instrumentalities, and must be reasonably safe for the performance of the work required to be performed by the servant. * * * Knowledge on the part of the employer as to the unsafe character of the offending animal is, of course, indispensable to a recovery by the employee.

"A master who furnishes his servant a horse which is possessed of dangerous or vicious propensities is bound to warn or instruct the servant concerning such characteristics."

See Central Lumber Co. v. Porter, 139 Miss. 66, 103 So. 506, 42 A. L. R. 221; 2 Am. Jur., Animals, section 72, page 747.

The court held in Miller v. Blood, 217 N. Y. 517, 519, 520, 112 N.E. 383, 384, in a servant's action for injury in the course of his employment, that the jury was warranted in finding the defendant negligent when it appeared defendant knew, but the servant did not, that the team of horses furnished the servant was balky. The court said: "The company, as the employer, was under the duty to furnish instrumentalities and appliances reasonably safe and suitable for the authorized use to be made of them by the plaintiff as the employee. The duty related and was applicable to the horses, as well as to the harness and truck and the appliances connected with it. [Citing many cases.] Failure on the part of the company to fulfill such obligation constituted negligence, and actionable negligence in case it caused or contributed to the injuries received and those injuries were reasonably apprehensible."

V. The facts shown herein disclose no assumption of risk by plaintiff. He had not ridden the horse for two years

and was under the impression it was as gentle and quiet as it had been, until he became suspicious of the hitch defendant had placed on the animal. Then the reassurance of defendant quieted his fear. When plaintiff discovered the peril defendant placed him in by walking out ahead and immediately jerking the lead rope, it was too late for him to retire.

It is true, when it is shown that the servant knew the peril to which he was exposed the doctrine of assumption of risk applies. Mace v. Boedker & Co., 127 Iowa 721, 104 N.W. 475; Laws v. Richards, supra, and cases cited therein. But such is not the case before us, for while plaintiff said the animal was quiet and gentle, it is clear he did not know its present propensities. He was speaking from his past knowledge of the animal and said as much. Defendant knew much more about this horse as it had been kept on his farm. While we do not say the horse was shown to be dangerous, defendant's knowledge of it and the fair inferences to be drawn from the actions and statements of defendant at that time would justify, we think, a jury finding that he did not perform his duty to exercise ordinary care for plaintiff's protection. Such care of course would be the care an ordinarily careful and prudent person would have exercised under the same circumstances. We do not believe it can be said, as a matter of law, that the defendant exercised ordinary care in proceeding to leave the horse's head and walk out in front of it some 25 feet, over plaintiff's objections, and by giving a good jerk on the horse's lead rope when its head was forcefully held down. Plaintiff contends, with some merit, that this act was as imprudent as shooting a gun near the horse or slapping it on the flank, and could be expected to startle and alarm the animal. Nevertheless, reasonable minds may differ as to whether defendant breached his duty to plaintiff.

We said in Bell v. Brown, supra, 214 Iowa 370, at 377, 239 N.W. 785, at 789: "The rule as to whether negligence claimed to be the proximate cause of an injury is a question which should be submitted to the jury is the same as applied to any other question of fact involved in the case. If reasonable minds, having before them all of the facts upon the question, could reach but one conclusion, the question then becomes one for the

court; but if, under the proven or admitted facts, different minds might reasonably reach different conclusions, the question is then one of fact for the determination of the jury [citing cases]."

 We realize such cases as we have before us are most difficult for a trial court, as they are for this court, for while the law is fairly well settled, the application thereof to factual situations is sometimes quite troublesome. Here it was especially so, for it seemed hard for plaintiff to clearly express himself and relate the circumstances. However, considering the whole record, we feel he has produced sufficient evidence and developed sufficient fair inferences of a breach of duty of defendant toward plaintiff, unexplained at this time, to justify the submission of this fact question to the jury.

We conclude therefore, in the light of all the facts in evidence, plus the fair inferences to be drawn therefrom, and the applicable law, that the trial court should have denied the motion to direct a verdict at the close of plaintiff's evidence, and for that error the case is reversed and remanded for a new trial.—Reversed and remanded.

All JUSTICES concur except PETERSON, J., who takes no part.